Filed 4/30/15  P. v. Solorzano CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAUL GONZALEZ SOLORZANO,<br><br>    Defendant and Appellant. | D065368<br><br><br><br>(Super. Ct. No. JCF31284) |


APPEAL from a judgment of the Superior Court of Imperial County, Donal B. Donnelly, Judge.  Affirmed.


Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Raul Gonzalez Solorzano was convicted of one count of

1

forcible oral copulation by a minor over 14 years old (Pen. Code,[1] § 288a, subd. (c)(2)(C)) and one count of sexual battery by restraint (§ 243.4, subd. (a)).  Both counts involved sexual assaults on J., his 17-year-old daughter.  Solorzano was sentenced to 13 years in prison.

One piece of evidence used against Solorzano was an image found on J.'s telephone of him holding his erect penis in his hand.  J. testified Solorzano forced her to take the photograph of his penis.  On appeal, Solorzano argues the trial court erred in excluding other videos and still images found on J.'s cellular telephone.  Solorzano also argues his conviction for forcible oral copulation should be reversed because there is insufficient evidence he coerced his daughter to orally copulate him.  We reject these contentions.

The excluded videos and still images on J.'s telephone were not directly related to the charges against Solorzano and, contrary to his argument on appeal, only tangentially related to J.'s credibility with respect to her use of the telephone to send and receive intimate images.  Although the excluded videos and still images contained fairly graphic sexual references and images sent from other sources, they reflected no more than an adolescent's view of what is titillating, humorous or interesting.  The trial court did not abuse its discretion in excluding them as unduly prejudicial.

J.'s testimony about what occurred, her age, Solorzano's role in her life, and her fairly prompt reporting of the incidents to her mother, were more than sufficient evidence J. was the victim of coercion and, thus, the victim of forcible oral copulation within the

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

meaning of section 288a, subd. (c)(2)(C).

SUMMARY

A.  J.'s Version

    1.  *Church*

On Sunday, July 7, 2013, J. went to church with her mother and her sister, D.  At church, J., who was crying, told her mother and her pastor that early in the morning of Saturday, July 6, 2013, Solorzano had "touched" her.

    2.  *Cell Phone Picture*

At church, J. showed her mother a picture on her cell phone of Solorzano holding his erect penis in his left hand; according to J., very early the previous Saturday morning she was in the living room of the home her mother, Solorzano and four of their five children shared.  According to J., Solorzano was on a couch in the living room under a blanket and was talking to J. about taking pictures with his cell phone; at one point, Solorzano took the blanket off, exposed his erect penis to J. and directed her to take a picture of it.

    3.  *Oral Copulation and Sexual Assault*

J. complied and took a photograph of her father's erect penis.  According to J., Solorzano then grabbed J.'s left hand and guided her hand onto his penis and moved her hand up and down on it.  Solorzano then grabbed the back of J.'s head and pushed her head down to his penis; J. "just stopped thinking" and was in shock and began orally copulating Solorzano.  J. pulled her head away from Solorzano's penis.  Solorzano then grabbed J.'s wrist and took her into a bedroom where he dropped his pants and underwear and pulled down J.'s shorts and underwear.  Solorzano pinned J. against the bed, fondled

3

her buttocks and vagina and rubbed his penis against her vagina. J. told him not to put his penis inside her. Solorzano's penis did not penetrate J.'s vagina, but he did ejaculate and some of his semen went onto J.'s leg.

When Solorzano turned away from her, J. grabbed her shorts and underwear and left the bedroom. J. went to her own bedroom and was unable to sleep; she did not tell anyone in the household about what had happened because she thought it was "sick," "nasty," "disgusting," and she was afraid of Solorzano.

While he was committing the sex acts, Solorzano repeatedly told J., "Don't tell anybody."

On the following evening, J. fell asleep on the couch in the living room. When she woke up, Solorzano touched her and again exposed his penis to her. Solorzano told her to touch his penis until he ejaculated. She told him "no," got up from the couch and went to her bedroom and locked the door.

At trial, J.'s mother testified that she and Solorzano had not had sexual relations in more than a year and slept in separate rooms.

B. Solorzano's Statements

In response to J.'s report to her, J.'s mother told. J. and her sister D. to drop her off at their home and go to a donut shop. J.'s mother then went inside her home by herself and put Solorzano's clothes in a trash bag. When Solorzano drove up to the home, she threw the bag towards him. She then told Solorzano, "I know what you did." Solorzano responded, "It was her F'ing fault."

J.'s mother then called a police officer who had worked on a prior case in which J. was the victim of a sexual assault. J.'s mother and J. met with the police officer, and they

4

disclosed what Solorzano had done.

After receiving J.'s report, police officers went to Solorzano's parents' home, where Solorzano was staying. Solorzano approached the officers' patrol car and volunteered the following statement: "I didn't do it. It's all her fault." One of the officer's responded, "What didn't you do?" Solorzano answered the officer's question by stating: "What [J.'s mother] said." Solorzano then gave the officers his version of what occurred. Solorzano stated he was asleep on the couch when he woke up and saw J. "jacking him off." He told her to stop. According to Solorzano, J. told him she wanted to take a picture of his erect penis and he agreed; after J. took the picture, she then orally copulated him.

Solorzano was arrested and charged with multiple sex crimes.

C. Trial

At trial, J. recapitulated what she told her mother and law enforcement personnel. At times during the trial, J. appeared quite upset when asked to recount details about her father's conduct, which she said repulsed her. At one point, she stated that she had not deleted the picture of Solorzano's penis because it was very upsetting to look at the image.

Solorzano presented a version different from the one he initially provided to the police officers who arrested and later questioned him. At trial, Solorzano testified that, after he fell asleep on the couch, he woke up when he felt someone rubbing his penis and saw J. rubbing and then orally copulating him. He testified that he pushed her away, told her not to tell anyone because it was disgusting and wrong, and she ran to her bedroom. At trial, Solorzano denied posing for the photograph of his erect penis. Solorzano also

5

testified that he did not initiate sexual contact with J. or force her to engage in any sexual acts with him.

Solorzano also presented evidence from a friend and former co-worker of J.'s, Katrina Esparza. Esparza testified that, during the summer of 2012, she and J. worked together at a local wildlife refuge and they became friends. Esparza testified that she had seen pictures of a young man stroking his penis on J.'s phone and naked pictures of J. herself on J.'s phone. According to Esparza, J. explained that she had made contact with the young man in the pictures on the internet and had shared intimate photographs with him.

Esparza conceded that she began seeing Solorzano's nephew Michael Solorzano on a social basis in the summer of 2013; that on October 13, 2013, Michael Solorzano told her about the charges his uncle was facing; and that on October 14, 2013, her relationship with Michael Solorzano became more serious. Esparza further testified that, on October 30, 2013, she went to the public defender's office and told them about what she had seen on J.'s telephone. Esparza conceded that in October 2013, J. asked her if she was talking to Michael Solorzano and she denied having contact with him; Esparza admitted that this had been a lie.

Michael Solorzano also testified. He admitted that he was upset about the criminal charges his uncle was facing and admitted telling Esparza about them. Michael Solorzano denied there was any connection between Esparza's willingness to appear as a defense witness and the fact that his relationship with Esparza had recently become more serious.

J. denied taking naked pictures of herself and sending them to anyone and denied

6

sharing intimate pictures of herself or anyone else with Esparza.

During trial, Solorzano also attempted to enter into evidence pictures and videos found on J.'s phone that were of a sexual or intimate nature. However, the trial court sustained the prosecutor's objection to the pictures found on the phone on the grounds they were unrelated to the charges against Solorzano and were not directly related to Esparza's claims about what she had seen on J.'s phone.

DISCUSSION

I

In his first argument on appeal, Solorzano argues that the trial court erred in excluding the pictures and videos found on J.'s phone. He argues the pictures and videos were important evidence that was consistent with Esparza's testimony about what she had seen on J.'s telephone and undermined J.'s testimony about being upset looking at the image of her father's penis.

A. The Pictures and Videos

Prior to trial, Solorzano's counsel was unaware J.'s telephone was in the custody of a local law enforcement agency. During trial, this circumstance was disclosed and defense counsel and the prosecutor examined the phone. They discovered 22 still images on the phone; the images were of coarse and crude statements that third parties had sent to J. or which she had forwarded to others. None of the still images contained sexual images of J. or anyone she knew personally. The parties also discovered three videos on the phone: one video depicted J.'s sister trying to take a picture of J. while she was in the shower and J. asking her not to; a second video was of J. and Solorzano in conversation and Solorzano admitting that J. was correct about something; and the third video was of

7

J. and her mother at the police station reporting the sexual assault. In it, J. appears relatively calm and makes reference to old computers and illegal evidence.

B. Trial Court's Ruling

In excluding the still images and videos, the trial court stated: "I'll find the probative value is slight, because, unlike the evidence I had permitted by Katrina Esparza that the alleged victim actually photographed her own private parts and sent that to another man and then also received photographs and videos of the other man's private parts, these postings don't reflect that. Although there may be figures here engaged in what looks to be sexual activities, these are clearly not photographs of anyone -- they don't appear to be photographs of anyone -- they don't appear to be photographs of anyone the alleged victim knows and actually took or received from another friend.

"Instead, they appear to be jokes and little sayings and controversial phrases that teenagers would share about sexual activity. And, of course, teenagers, including 17-years-olds, that would be fairly common topic to share and laugh about and titillate each other. But these are very distinct from the evidence that I had admitted, that is, the actual photographing of private parts of the actual actors.

"For that reason I don't think the probative value is as strong as it might be with the evidence offered by Katrina Esparza.

"Against that, under [Evidence Code section] 352 I weigh the substantial risk of prejudice and confusion and undue consumption of time. And I find substantial risk of prejudice as follows. That the jury would impermissibly draw an inference that because [J.] received these postings and saved them on her phone, that she had a willingness or history of engaging in sexual conduct. Of course, that's strictly forbidden by the rape

8

shield law. I think that inference is the risk of the jury drawing that inference is substantial. And there's -- when weighed against slight probative value, that prejudice outweighs relevance and should be excluded."

C. Legal Principles

"'A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Brown* (2003) 31 Cal.4th 518, 534.)

Here, as the trial court indicated, its discretion was constrained by California's rape shield statutes, which limit the use of evidence of the prior sexual conduct of victims of forcible sex crimes. (Evid. Code, §§ 782, 1103, subd. (c); see *People v. Chandler* (1997) 56 Cal.App.4th 703, 708.) "While strictly precluding admission of the victim's past sexual conduct for purposes of proving consent, Evidence Code section 1103, subdivision (c)(4), allows the admission of evidence of prior sexual history relevant to the credibility of the victim. Because the victim's credibility is almost always at issue in sexual assault cases, Evidence Code section 782 specifies a procedure requiring an in camera review of the proffered evidence to diminish the potential abuse of section 1103, subdivision (c)(4). The defense may offer evidence of the victim's sexual conduct to attack the victim's credibility if the trial judge concludes following the hearing that the prejudicial and other effects enumerated in Evidence Code section 352 are substantially outweighed by the probative value of the impeaching evidence.

"By narrowly exercising the discretion conferred upon the trial court in this

9

screening process, California courts have not allowed the credibility exception in the rape shield statutes to result in an undermining of the legislative intent to limit public exposure of the victim's prior sexual history. [Citations.] Thus, the credibility exception has been utilized sparingly, most often in cases where the victim's prior sexual history is one of prostitution. [Citations.] Evidence the victim participated in a form of prostitution is conduct involving moral turpitude which is admissible for impeachment purposes. [Citation.] Prostitution is a crime of moral turpitude. [Citations.]" (*People v. Chandler*, *supra*, 56 Cal.App.4th at pp. 708-709, fn. omitted.)

In evaluating under Evidence Code section 352 whether evidence of a victim's sexual history is sufficiently related to the victim's credibility, a trial court may, in its discretion, exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Accordingly, "'evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.'" (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

D. Analysis

Here, the items in dispute were clearly subject to Evidence Code sections 782 and 1103, subdivision (c). The term "sexual conduct" as used in Evidence Code section 782

10

has been given a broad meaning. (See *People v. Casas* (1986) 181 Cal.App.3d 889, 895 [prior solicitation of prostitution sexual conduct subject to statute]; *People v. Daggett* (1990) 225 Cal.App.3d 751, 757 [prior molestation sexual conduct].) The rationale of the Legislature in enacting the rape shield law was that "the fear of personal questions deterred victims from filing complaints." (*Casas*, at p. 895.) This rationale would certainly apply to the sort of sexual and provocative fantasizing manifested in the images excluded by the trial court. Adolescent victims of forcible sex acts would plainly be deterred from reporting those crimes if they knew they could be questioned, without limitation, with respect to all the sexual innuendo and fantasies that might be found on their cell phones or traced to them on social media.

Here, the disputed items of evidence were not directly related to the offenses charged and were only tangentially and inferentially related to evidence introduced with respect to the victim's credibility. With respect to Esparza's testimony about what she had seen on J.'s telephone, the disputed images, which any curious teenager may have found on the internet or received from other teenagers, do not give rise to any direct inference that the teenager would go further and share intimate photographs of herself or save intimate pictures of anyone else. In recognizing the material difference between what teenagers might view as merely titillating or humorous and intimate images of themselves or people they know, the trial court acted well within the bounds of reason and its discretion.

We also reject Solorzano's contention the images found on J.'s telephone were somehow inconsistent with the fact that she stated the picture of her father's penis was upsetting to her and that she did not delete it from her phone because she did not want to

11

look at it. The salacious and provocative pictures found on J.'s phone, while they may show J. was somewhat sexually sophisticated and aware, do not undermine the credibility of her reaction to the picture of her own father's penis and her emotional response to recollection of the circumstances under which the picture was taken. Indeed this rationale for admission of the images appears to have less to do with J.'s credibility and strikes very close to forbidden use of prior sexual conduct to prove that J. likely consented to her father's acts. In this regard, we note that "[g]reat care must be taken to insure that this exception to the general rule barring evidence of a complaining witness'[s] prior sexual conduct, i.e., Evidence Code section 1103, [former] subdivision (b)(1), does not impermissibly encroach upon the rule itself and become a 'back door' for admitting otherwise inadmissible evidence." (*People v. Rioz* (1984) 161 Cal.App.3d 905, 918-919.)

Given the sexual and provocative nature of the images, the trial court could also reasonably conclude that it might easily and unfairly prejudice J. in the minds of one or more of the jurors. The trial court could also reasonably conclude that the number of images and their nature would consume an undue amount of time if J. were required to explain each of them to the jury; in this regard, we again note the evidence was only somewhat probative with respect to entirely collateral issues. In sum then, the disputed evidence was only slightly probative and carried a very real risk of prejudice and undue consumption of time. The trial court did not abuse its discretion in excluding it.

II

Next, Solorzano contends the record does not contain sufficient evidence that when J. orally copulated him he acted forcibly within the meaning of section 288a, subdivision (c)(2)(C). We disagree.

12

As defined by our Penal Code, forcible sex acts may occur notwithstanding the victim's unwillingness or inability to physically resist the defendant. (See *People v. Griffin* (2004) 33 Cal.4th 1015, 1024–1025.) "'[T]he fundamental wrong at which the law of rape is aimed is not the application of physical force that causes physical harm. Rather, the law of rape primarily guards the integrity of a woman's will and the privacy of her sexuality from an act of intercourse undertaken without her consent. Because the fundamental wrong is the violation of a woman's will and sexuality, the law of rape does not require that "force" cause physical harm. Rather, in this scenario, "force" plays merely a supporting evidentiary role, as necessary only to insure an act of intercourse has been undertaken against a victim's will.' [Citation.]" (*Ibid.*)

Of significance here is the theory of rape, penetration and oral sex by duress, which are all species of the forcible crimes proscribed by sections 261, subdivision (a)(2), 289, subdivision (a)(1)(A), and 288a, subdivision (c)(2)(A). In defining forcible rape by duress, section 261, subdivision (b) states: "As used in this section, 'duress' means a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and his or her relationship to the defendant, are factors to consider in appraising the existence of duress." (See *People v. Leal* (2004) 33 Cal.4th 999, 1004–1005; CALCRIM Nos. 1000, 1015, 1045.) This definition makes it plain that a victim's acquiescence in a sex crime will not deprive the crime of its forcible nature.

Sex crimes by duress have repeatedly been found in circumstances very similar to

the ones presented here, where the perpetrator is an adult member of a child victim's household and uses his psychological authority rather than overt physical force to compel compliance. (See *People v. Cochran* (2002) 103 Cal.App.4th 8, 14 (*Cochran*); *People v. Senior* (1992) 3 Cal.App.4th 765, 775 (*Senior*); *People v. Superior Court* (*Kneip*) (1990) 219 Cal.App.3d 235, 238 (*Kneip*).) In *Cochran*, the court found sufficient evidence of duress where a father was convicted of forcible lewd conduct on his nine-year-old daughter. (*Cochran*, at p. 12.) The daughter testified that her father instructed her to engage in various sexual acts, including intercourse and forced sodomy. The daughter testified that she was not afraid of her father, but that he told her not to tell anyone because he would get into trouble and go to jail and that he gave her money and gifts when they were alone. The defendant was five feet nine inches tall and weighed 100 pounds more than his four-foot-three-inch daughter. In finding duress, we stated: "This record paints a picture of a small, vulnerable and isolated child who engaged in sex acts only in response to her father's parental and physical authority. Her compliance was derived from intimidation and the psychological control he exercised over her and not the result of freely given consent." (*Id*. at pp. 15–16.)

In *Senior*, the court found duress where a father forcibly molested his 14-year-old daughter. The court noted that the defendant was the victim's father and an authority figure to her; the defendant threatened to hit the victim and told her that if she did not submit to the molestation it could result in a divorce, thus jeopardizing the family unit. (*Senior*, *supra*, 3 Cal.App.4th at p. 775.)

In *Kneip*, the defendant was accused of molesting his small sons and a family friend. In finding sufficient evidence of duress, the court stated: "Where the defendant is

14

a family member and the victim is young, other courts have also looked to factors such as the position of dominance and authority of the defendant and his continuous exploitation of the victim in determining the existence of force or fear." (*Kneip*, *supra*, 219 Cal.App.3d at p. 239.)

In light of the cases in which rape or other sex crimes by duress have been found where the defendant was an adult member of the victim's household, here we have little hesitation affirming Solorzano's convictions. Solorzano's role as J.'s father, and J.'s testimony about the physical control he exerted over her hand and head before and during the oral copulation, as well as later in the bedroom, provide ample evidence of the psychological and physical coercion that is sufficient to establish duress. (See *Cochran*, *supra*, 103 Cal.App.4th at pp. 15–16.) Thus, there was sufficient evidence to support Solorzano's conviction.

DISPOSITION

The judgment of conviction is affirmed.


BENKE, Acting P. J.

WE CONCUR:


McINTYRE, J.


AARON, J.

15