Filed 1/22/16  P. v. Velasquez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B262577 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA134555) |
| v. | |
| JAIME GARCIA VELASQUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Raul A. Sahagun, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \*

Defendant Jaime Garcia Velasquez appeals from his conviction of two counts of rape of a child over 14 years old (Pen. Code, § 261, subd. (a)(2); counts 11 & 12). Defendant does not challenge his convictions of sex crimes against the same victim, his stepdaughter, including 10 other counts of rape (§ 261, subd. (a)(2); counts 1-10), forcible oral copulation of a minor over 14 years old (§ 288a, subd. (c)(2)(C); counts 13-18), and forcible sodomy of a child over 14 (§ 286, subd. (c)(2)(C); counts 19-21) against the same victim. Defendant contends the evidence was insufficient to support his conviction of two counts of rape, which were caught on video on March 29, 2014, reasoning there was no evidence of force or duress, and the video footage suggested that the victim consented to have sex with defendant. Finding no merit in this contention, we affirm the judgment below.

**FACTS**

The victim's mother, Laura S., testified that she met defendant when her daughter K.R. was five years old. They married when K.R. was 11 or 12 years old. The family, including K.R.'s brother who was four years older than K.R., lived together in a home in South Gate. When Laura S.'s son was 15, he started having behavioral problems and problems at school. By the time he turned 17, defendant had "chased him away." After her brother left home, K.R. started crying a lot. Defendant began treating K.R. "like a friend."

When K.R. was 14, Laura S. started a new job. Defendant typically worked from 10:00 a.m. to 7:00 p.m., and would drop Laura S. off at work between 5:30 and 6:30 in the morning. Defendant would be alone at the house with K.R. after Laura S. left for work.

When K.R. was 15, Laura S. and defendant had a *Quinceañera* for her. Leading up to the party, she was crying a lot, and her academic performance had started to decline. She also started to get sick a lot and complained of stomach problems. Laura S. believed K.R. was sad because she missed her brother.

When K.R. was 17, Laura S. received an anonymous letter telling her to "take care of [her] daughter . . . there was something happening in [her] house." Laura S.

2

confronted K.R., and asked if K.R. had anything to tell her. K.R. would not answer Laura S. On March 28, 2014, Laura S. asked the maintenance worker for her building, Mr. Misael Mauz, to install cameras in her home. He later confirmed that he installed them that same day.

The following morning, Laura S. went to work. On March 30, 2014, Mr. Mauz informed Laura S. that something had been taped. She viewed the video which showed defendant getting into K.R.'s bed, taking off his boxers, and "playing there for a long while." That same day, Laura S. went to the South Gate police station to make a report, and gave police the video.

On the night that Laura S. made her report to the police, defendant called her and apologized, and said there were "no words about what he's done. That he was going to leave. That he would not bother [her] again." That night, Laura S., Laura S.'s mother, Mr. Mauz, and K.R. went looking for defendant, and found him in his car near his place of business. Laura S. flagged a police officer and pointed out defendant. Defendant was taken into custody. While he was in jail, defendant wrote to Laura S., asking for forgiveness, and stating that "justice will take care of making me pay -- all the evil that I have caused. And when I am finished paying with jail, will come the justice of God."

Mr. Mauz testified that in March 2014, Laura S. asked him to install cameras in her residence. He concealed two cameras in lamps in the living and bedroom. The camera in the living room was pointed towards K.R.'s bed. The cameras recorded video over the course of one day, which was placed on a disk. Mr. Mauz gave the disk to Laura S. The video showed defendant and K.R. The video first depicted defendant and K.R. in K.R's bed in the living room. A video taken that same day showed them in the bedroom. The video was broken up into several segments, and was recorded between 7:30 a.m. and 9:00 a.m. However, there was only 30 minutes of footage because the battery on Mr. Mauz's phone, which was recording the video, died a number of times. The video was played for the jury.

K.R. testified that she met defendant when she was five years old, and he initially treated her well. Things changed when she was 14, and defendant began sexually

3

abusing her. The first time was on a Saturday morning in mid-September. Defendant "creeped up to [her] bed" wearing only boxers. He got into her bed, grabbed her waist, and pulled her towards him. She told him to stop, and he told her "not to worry, that [she] was going to be okay, the nobody was going to be able to hurt [her] no more." Defendant rubbed K.R.'s back and stomach. She tried to push him away, but he held her tight, and told her "he was going to be there for the rest of [her] life, that [she] was . . . going to be his baby." She was crying hard when defendant pulled her pajamas off and penetrated her vagina with his penis. It was painful, and K.R. felt something "pop." Defendant asked why she was crying, telling her what they were doing was "normal" and that she would eventually "do [it] with someone else [a]nd that [she] was going to be experienced." Once defendant finished with her, he went to his room and "slammed" the door. K.R. cried and waited for defendant to leave for work. Once he was gone, she went to the bathroom and was bleeding. Her back and vagina hurt. K.R. took a shower and went back to bed.

Later that evening K.R. wanted to tell her mother what happened, but defendant was always nearby, and K.R. was scared. K.R. did not know how defendant would react if she told Laura S. what happened.

The next time defendant approached K.R., she told him she would tell her mother what he had done. Defendant warned K.R. that she could not tell because Laura S. would not believe her, and that something "bad" would happen if she told. Defendant told K.R. she was his "baby for the rest of [her] life" and that he would "be there all the time for [her]." K.R. was worried because defendant had kicked her brother out of their home, and thought defendant might do something to him.

After the first incident with defendant, K.R. went to live with her uncle in Oakland for several months. K.R. returned home for her 15th birthday. Both Laura S. and defendant were preparing for her party, but Laura S. was struggling financially to make the party happen. Defendant told K.R. that if she "behaved," he would help pay for her party. He wanted her to "do everything as he says to. Anywhere, any time." K.R. did not want to have sex defendant, and told him so. Defendant threatened to tell Laura S. to

cancel the party. A little before K.R.'s birthday, defendant tried to have sex with her. He told K.R. that if she did not want to have sex with him, she should give him a "hand job." K.R. told him she did not want to, but he threatened to "spoil[]" her party, so she complied. When her hand got tired, he told her there was a faster way and laid her down and told her he was helping her grow as a woman. Between the age of 15 and 16, defendant had sex with K.R. 20 or 25 times.

Defendant also told K.R. to try new things so she "wouldn't be inexperienced when [she ] had her own partner." He had K.R. perform oral sex on him approximately 10 times. K.R. told him "no" and that it was "gross." At times, K.R. tried to push defendant off of her, but he "would show his aggressiveness." "Every time" K.R. refused defendant, he would take out his aggression on Laura S. by locking her out of their bedroom and forcing her to sleep in the living room with K.R.

K.R. would sleep covered from head to toe like a "burrito" with the hope that defendant would get tired of uncovering her and would leave her alone. "[I]t never worked" and did not prevent defendant from having sex with her.

Defendant also had anal sex with K.R. The first time was when she was almost 16. K.R. cried, and defendant told her he was "tired" of her crying and to "fake being happy" and "smile" so he could finish faster. It hurt K.R. and caused her to bleed and have diarrhea. Later that night, Laura S. asked K.R. if anything was wrong. K.R. said she had cramps. She wanted to tell her mother but was scared, and defendant was always lingering around. K.R. was scared of how defendant would react, and how others would look at her.

Whenever K.R. would cry, both Laura S. and defendant would ask her what was wrong. She lied and said she was crying because of her brother.

Defendant had anal sex with K.R. four times, and she told him "no" each time. He never listened to her. Defendant also put his mouth on K.R.'s vagina on her 16th birthday, telling her it was his "present" for her. She told him to stop, but he ignored her.

The night before K.R.'s 17th birthday, defendant told her he had a present for her, and that he would take her to school the following morning. K.R. said she was going to walk to school with her friend, because she had to be there early to take the California High School Exit Exam. Defendant told K.R. to cancel her plans with her friend, and insisted that he would take her to school. The next morning, defendant crept into her bed, pulled her pajamas down, and had sex with her like he "always" did. But this time, it took him 30 minutes. K.R. was crying, but she was turned away from defendant so he could not see her, because her crying would make him "mad." K.R. was not able to take her test that day because defendant made her late. It had been one of her last opportunities to take the test, so K.R. had to coordinate with her counselor to take a make up test so she could graduate.

Defendant also sometimes took photographs and videos of him having sex with K.R. He told K.R. that he needed them because "when you're not available, when your mom's not available, I look at this and this satisfies me."

When K.R. was 17, if she refused sex with defendant, he would lock her out of the house. He would also follow her around and spy on her when she was away from home. Defendant was controlling; he would not allow her to walk home from school with any of her friends. Defendant told K.R. that she belonged to him and no one else.

K.R. sometimes went to work with defendant. If they were alone there, defendant would take her to a back room to show her pornography. The pornography was usually of older men doing things with teenaged girls.

Sometimes when defendant was having sex with K.R., he asked her to scratch his back so he would finish faster. K.R. complied because she wanted defendant to "get off" her and leave her alone.

At no point over the time defendant was abusing her did K.R. want to have sexual relations with defendant. K.R. gave in to defendant's demands because when she would refuse he would lock her out of the house, or throw her things on the floor. K.R. told defendant that once she was 18, he could no longer hurt her because she was going away to college. Defendant told her that she was not going to leave. After K.R. told him this,

6

he stopped approaching her for sex, and told her he would leave her alone. However, defendant later changed his mind, and said he "needed [her] again."

As to the incident which was recorded on March 29, 2014, K.R. testified that the night before the incident, Laura S. had asked K.R. to confess if anything was wrong. K.R. felt she was doing something wrong because she was lying to her mother, and she felt like she was "betraying" her mother because of what was happening with defendant. K.R. felt she did not have a choice about the things happening with defendant because of the consequences of telling. Defendant told her that no one would believe her, and that everyone would see her as the "dirty one." She believed defendant because he kicked out her brother, and because her entire family had turned its back on her and her mother because they did not like defendant.

On March 29, K.R. was crying when defendant had sex with her. He would get mad because she never pretended to enjoy it.

Nurse practitioner Toyetta Beukes performed a sexual assault response team (SART) exam of K.R. on March 31, 2014. K.R. reported a history of sexual abuse by defendant that was consistent with her testimony at trial. K.R. also told Ms. Beukes that defendant threatened to harm her brother who was in jail, telling her he "knew people" who could hurt him, and that he threatened to hurt Laura S. There were injuries to K.R.'s vagina and anus which were consistent with the history K.R. reported.

Dr. Earl S. Fuller, a gynecologist, testified for the defense that K.R.'s injuries were consistent with nonforcible intercourse.

## DISCUSSION

Defendant contends there was insufficient evidence of force or duress for the March 29, 2014 incident which was caught on tape. He contends that K.R. "did not testify as to any compulsion specifically in terms of the March 29, 2014 incident," and that her "passive acquiescence" could have been interpreted as consent.

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is

reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence. [Citation.] . . . [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]' [Citation.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)

Penal Code section 261, subdivision (a)(2) requires that a defendant use "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another" to accomplish sexual intercourse against the victim's will. "[I]n a forcible rape prosecution the jury determines whether the use of force served to overcome the will of the victim to thwart or resist the attack, *not* whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting her attacker. The Legislature has never sought to circumscribe the nature or type of forcible conduct that will support a conviction of forcible rape, and indeed, the rape case law suggests that even conduct which might normally attend sexual intercourse, when engaged in with force sufficient to overcome the victim's will, can support a forcible rape conviction. [Citation.]" (*People v. Griffin* (2004) 33 Cal.4th 1015, 1027.)

Duress has been defined as " 'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' [Citations.]" (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13 (*Cochran*); see also Pen. Code, § 261, subds. (a)(2), (b).) To determine whether there is substantial evidence of duress, it is necessary to consider the totality of the circumstances, including the age of the victim, the age difference between the victim and the defendant, any disparity in size between the victim and defendant, and the relationship between the victim and defendant. (*Cochran*,

8

*supra*, at pp. 13-14; see also *People v. Senior* (1992) 3 Cal.App.4th 765, 775.) These and other factors may contribute to the victim's perception of the defendant as being in a position of dominance or authority, to the victim's sense of physical vulnerability, or to the psychological coercion of the victim. (*Cochran,* at pp. 14-15.)

The evidence described above demonstrates defendant used his position as her stepfather, with the power to rule the household (kicking her brother out of the home, locking her mother out of her own bedroom, locking K.R. out of the house, preventing her taking her high school exit exam -- despite the extended family's expressed disapproval of defendant) to manipulate, threaten, humiliate and intimidate K.R. throughout her adolescent and teenage years. K.R. testified consistently that she resisted defendant and found his sexual assaults to be revolting and painful. The extensive evidence that defendant used force and duress when sexually assaulting K.R. over several years reasonably supported the inference that he also used force and duress as alleged in counts 11 and 12. Those two rapes, committed on March 29, 2014, were videotaped, first on K.R.'s bed in the living room, and later in the bedroom. The fact K.R. did not specifically testify that defendant used force and duress to commit those last two rapes, and the absence of video footage of a struggle, is irrelevant. K.R. testified she was crying as defendant raped her that day but tried to conceal her tears of humiliation and defeat from defendant because he became angry when she did not pretend to enjoy his assaults. Contrary to defendant's argument on appeal, we think that no reasonable jury could infer that K.R. consented to the assaults; substantial evidence supports the convictions of rape in counts 11 and 12.

## DISPOSITION

The judgment is affirmed.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.          RUBIN, J.

9