[No. H007224. Sixth Dist. Jan. 31, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIC ROBERTSON SENIOR, Defendant and Appellant.

## Counsel

Philip H. Pennypacker for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald S. Matthias and Jeremy Friedlander, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

ELIA, J.—

### 1. Introduction

Defendant Eric Robertson Senior appeals from the judgment following his conviction after jury trial of nine counts involving sexual molestation of his daughter (the victim), all by force, violence, duress, menace, or fear of immediate and unlawful bodily injury. Counts one and two involved lewdly touching her body before she was 14 years of age with the intent of arousing or gratifying his or her lust or passions. (Pen. Code, § 288, subd. (b).)[1] Counts three and seven involved penetrating her vaginal opening with a foreign object against her will for the purpose of sexual arousal, gratification, or abuse.[2] (§ 289, subd. (a).) The remaining five counts, four, five, six, nine, and ten, involved oral copulation against her will. (§ 288a, subd. (c).)[3] The jury found true enhancements that defendant kidnapped his daughter for

[1] Unspecified section references are to the Penal Code.

[2] Count eight, charging digital penetration of her vagina in a motel on September 11, 1989, was dismissed by the court after a section 1118.1 motion.

[3] The means and specific intents of these crimes are stated in the alternative in the Penal Code. The information charged them conjunctively, for example, requiring proof that the foreign object penetration was "for the purpose of sexual arousal, gratification *and* abuse . . . by means of force, violence, duress, menace, *and* fear of immediate and unlawful bodily

the purpose of committing counts nine and ten and found this not true of count seven. (§ 667.8, subd. (a).) Defendant was sentenced to thirty-three years' imprisonment, consisting of two fully consecutive midterms of six years each on counts nine and ten (§ 667.6, subd. (c)), seven fully consecutive lower terms of three years each on counts one through seven (§ 667.6, subd. (d)), two 3-year kidnapping enhancements of counts nine and ten with the second one stayed, and a three-year term stayed on count two pursuant to section 654.

Defendant testified at trial and essentially admitted every molestation with which he was charged.[4] The key issue at trial was whether defendant accomplished the molestation by force, violence, duress, menace, or fear of immediate and unlawful bodily injury. On appeal defendant challenges the sufficiency of the evidence of this element on counts three through seven. He also claims the court should have instructed the jury that this element of the charged offenses requires specific intent. He claims the court should not have instructed the jury to view his admissions with caution or admitted evidence of a threat to kill one of his children. Defendant makes three different arguments about counts nine and ten: he should not be punished separately for each; he could not have kidnapped his own daughter; the court failed to state reasons for fully consecutive sentences. For the reasons stated below, we are persuaded only by the last argument. We will reverse the judgment and remand for resentencing. The facts are stated where relevant.

## 2. *Trial evidence*

### A. *Counts one and two*

On January 14, 1989, two days before the victim turned fourteen, defendant entered her bedroom, put his hands under her shirt and pants, and touched her breasts (count one) and her vagina (count two). He said if she told anyone there would be a divorce. She tried to stop his hands with her hands. He told her to move her hands, it would not hurt, and she complied.

According to the victim, she pulled away and he pulled her legs back. He told her he would hit her if she moved and she might get hurt if she told anyone. He was often angry and sometimes hit her, her sister, and her brother for no reason. He always told her he was stronger and would hurt her if she ran away.

---

injury." (Our italics.) The jury was so instructed. The jury was also instructed they were alternatives (CALJIC Nos. 10.10, 10.42) and counsel so argued. No issue is made on appeal of the potential confusion arising from this method of charging.

[4]Defendant admitted that he licked her vagina at least three times, although he could not specifically recall doing so in August 1989 (count seven). Since only two other counts involved licking her vagina in January (count four) and September 1989 (count nine), defendant essentially admitted count seven.

According to defendant, he spanked all his children, but denied hitting them without reason and denied telling the victim if she tried to run away he would hurt her because he was stronger and bigger. Defendant denied ever threatening to hurt her to obtain compliance. Defendant denied ever grabbing her legs to keep her from leaving. He testified he never used force because he "never had to." She was often stiff and rigid but reluctantly accepted his advances because she was "extremely obedient."

According to defendant, this first molestation set the stage. He "gave her the lecture on the first time" and after that he "didn't have to" have a similar conversation.

### B. Count four

About two days after the victim's 14th birthday, defendant entered her room and told her to take her clothes off and lie down. She protested but complied. He touched her breasts and vagina and licked her vagina (count four).

### C. Counts three, five, and six

On one or more occasions in August 1989 defendant touched the victim's breasts, put his fingers inside her vagina (count three)[5], licked her vagina (count six), and made her suck on his penis (count five). According to the victim, she tried to pull away when he licked her vagina. He pulled her back. She tried to pull away from sucking his penis. He held her shoulders. Once during an August molestation he got her out of bed. She was shaking because she was cold. He pushed her down and told her to stop shaking. Defendant denied pushing her down and telling her to stop shaking.

### D. Counts seven, nine, and ten

On September 11, 1989, defendant came home and found a note from his wife saying she was leaving him after she had promised they would work things out. The victim had revealed the molestations to her mother at the end of January 1989 without saying her father had threatened to hurt her. The victim's mother had left with the six children for six days in early February but had returned. Defendant and his wife had talked about the molestation. Defendant had contacted their bishop and admitted the molestation to him during counseling.

---

[5]The prosecutor argued that count three occurred during the second incident in January, although also suggesting the jury could find defendant had committed the crime later. The charge involved the period from January through August 1989. The evidence of digital penetration in August was stronger, so we assume, as does defendant, that was the basis for his conviction.

After reading his wife's note, defendant picked up two of their children after school. She picked up three. Defendant drove up after his wife returned home and told two of their children to get into his car. He told her she would never be with them again and drove off. She called defendant's brothers to come over while waiting for the victim to come home from school. She left home with the victim and called defendant at home. He asked if she had the victim. She would not say. She testified in rebuttal over defendant's objection that defendant said if she did not come home in a half hour he would kill one of their children. On cross-examination defendant denied using the word "kill" but said that was the "flavor" of his message.[6]

Uncle Lee took the victim and her siblings out for a pizza dinner while her mother, defendant, and the bishop talked at her house. Defendant was distressed to hear the bishop say the church was going to take action. He felt his wife and his church were leaving him.

Defendant left and came to the pizza parlor around 7 p.m. According to defendant, he wanted to pick the victim up so she could talk to her mother and the bishop. According to the victim, defendant said her mother was in the car and wanted to talk with her. Defendant could not recall saying her mother was in the car. The victim saw her mother was not in the car when she was a few feet from it.

Defendant guided the victim into the car with his hands on her shoulders. He said her mother was talking to the bishop at home and wanted to talk to her. He drove to their nearby house and past it. According to defendant, he drove past his house when he saw the bishop was still there.

Defendant said he wanted to talk to the victim. He drove around, telling her his problems. He told her he was going to be excommunicated and he did not care anymore. They stopped twice for her to go to the bathroom. First they stopped at a gas station that had no bathroom. Then he told her to go in the parking lot of an office building.

According to the victim, while they were talking in the car, defendant said it was better that he take her out and molest her rather than kill her. She said she would rather be dead. He said angrily, " 'What do you want me to do, pull the car over and bash your head in?' " He said he was just kidding, but he did not seem to be.

According to defendant, the victim said it would be better if he bashed her over the head instead of molesting her. He replied, "[y]eah, like I'm going to pull over and bash your head in." He testified it was not a threat.

---

[6]Defendant initially denied ever telling his wife he was going to hurt the victim or their other children.

While they were driving around, he touched her breasts and put his finger inside her vagina (count seven). She tried to pull away but it did not help.

Defendant stopped driving to call his wife to see if everyone had left yet. He put the victim on the phone to her mother. They got back in the car and drove to a motel. According to defendant, he decided to go to a motel while driving around.

At the motel defendant locked the victim in the car, saying he did not want her kidnapped. She tried to get out, but could not unlock her door. Defendant called home from the motel. Defendant's brother Lee answered the phone.

According to defendant, he called to see who was still at the house. He said he would be home in an hour. Neither defendant nor Lee could recall defendant saying he would kill his wife and the victim if the police were called. Lee had never seen defendant be violent. A police officer testified Lee told him that evening defendant had threatened to kill both of them if the police were called. The officer assumed defendant was referring to the victim and himself.

Defendant got a motel room, unlocked the car door, and guided the victim inside the room with his hands on her shoulders. He shut and locked the door and told her to take her clothes off and act sexy. He touched her breasts and vagina and licked her vagina (count nine). He made her lick his penis (count ten). He took her back home after midnight.

According to the victim, defendant said he would hurt her if she did not act sexy. The victim told a police officer who interviewed her only that defendant said to act sexy. Defendant denied saying he would hurt her otherwise.

The victim told her mother that defendant had threatened on September 11 to bash her head in if she tried to get away. The victim did not tell the interviewing officer that defendant had threatened physical harm. The victim told a nurse who examined her that defendant had said he was stronger and would get her.

According to the victim, defendant touched her in ways she did not like about 12 times between January and September 11, 1989. According to defendant, he molested her 10 times. Three other times he stopped himself when she protested.

Around 2:30 a.m. on September 12, 1989, defendant told a police officer he had molested his daughter eight times over an eight-month period. He had

been trying to work out his problems and restrain himself from molesting her. He did not contact a counselor because they were required by law to report him.

### 3. *Element of force, violence, duress, menace, or fear of immediate and unlawful bodily injury*

#### A. *Sufficiency of evidence on counts three through seven*

Defendant contends there was insufficient evidence that the oral copulations and digital-vaginal penetrations involved in counts three through seven[7] were accomplished by "force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (§§ 288a, subd. (c), 289, subd. (a), 667.6, subd. (d).)

■ As this court recognized in *People* v. *Quinones* (1988) 202 Cal.App.3d 1154 [249 Cal.Rptr. 435], "force" means " 'physical force substantially different from or substantially in excess of that required for the lewd act.' " (*Id.* at p. 1158.) The jury here was so instructed. We agree there was insufficient evidence of this type of force used during any of the challenged counts, the oral-vaginal copulations in January (count four) and in August (count six), the oral-penile copulation in August (count five), and the digital-vaginal penetrations in August (count three) and in September (count seven). The evidence that defendant pushed the victim down because she was shaking in August was not correlated with any particular molestation.

We also do not regard as constituting "force" the evidence that defendant pulled the victim back when she tried to pull away from the oral copulations in August. (Contra, *People* v. *Pitmon* (1985) 170 Cal.App.3d 38, 48 [216 Cal.Rptr. 221]—physical manipulation of hand and pushing on back during lewd touching; *People* v. *Bergschneider* (1989) 211 Cal.App.3d 144, 154 [259 Cal.Rptr. 219]—pushing head against victim's hands during oral copulation; cf. *People* v. *Mendibles* (1988) 199 Cal.App.3d 1277, 1307 [245 Cal.Rptr. 553]—pulling head forward during lewd touching.) The "force" factor differentiates the charged sex crime from the ordinary sex crime. Since ordinary oral copulation and digital penetration almost always involve some physical contact other than genital, a modicum of holding and even restraining cannot be regarded as substantially different or excessive "force." There was no evidence here of any struggle, however brief. (*People* v. *Schulz* (1992) 2 Cal.App.4th 999, 1004 [3 Cal.Rptr. 2d 799].)

---

[7]The caption in defendant's opening brief refers only to counts three and seven, but the text discusses three through seven. Defendant's reply brief catches this mistake.

■ Physical control can create "duress" without constituting "force." "Duress" would be redundant in the cited statutes if its meaning were no different than "force," "violence," "menace," or "fear of immediate and unlawful bodily injury." (Cf. *People* v. *Pitmon, supra,* 170 Cal.App.3d at p. 50.) ■ As the jury here was instructed, "duress" has been defined as "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to first, perform an act which otherwise would not have been performed, or, second, acquiesced [*sic*] in an act to which one otherwise would not have submitted." As this court recognized in *People* v. *Superior Court (Kneip)* (1990) 219 Cal.App.3d 235 [268 Cal.Rptr. 1], duress involves psychological coercion. (*Id.* at p. 238.) Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. (*People* v. *Pitmon, supra,* 170 Cal.App.3d at p. 51; *People* v. *Superior Court (Kneip), supra,* 219 Cal.App.3d at p. 239.) ■ "Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim" is relevant to the existence of duress. (*People* v. *Superior Court (Kneip), supra,* 219 Cal.App.3d at p. 239.)

Here there was evidence that defendant subjected the victim to several psychological pressures related to his molestations. First, he was her father and an authority figure to her. Second, during the first molestation he threatened to hit her if she moved.[8] The victim felt he had occasionally hit her and her siblings without reason. Third, defendant's pulling the victim back and physically controlling her when she attempted, albeit ineffectually, to pull away during counts one, two, five, six, and seven suggested that greater physical resistance would be answered with greater physical force.

A fourth psychological pressure on the victim to submit to molestation was defendant's warning to her after the first molestation that to talk about it could result in divorce. In our view such a warning also implied jeopardy to the family unit if she failed to submit to future molestation. Defendant relies on opinions that distinguish between warnings enjoining nondisclosure and noncompliance. (*People* v. *Bergschneider, supra,* 211 Cal.App.3d at p. 154, fn. 8; *People* v. *Hecker* (1990) 219 Cal.App.3d 1238, 1251, fn. 7 [268 Cal.Rptr. 884].) We doubt that young victims of sexual molestation readily perceive this subtle distinction. A simple warning to a child not to report a molestation reasonably implies the child should not otherwise protest or resist the sexual imposition.

Defendant suggests duress can only be shown by evidence of force used in a prior molestation. *Pitmon,* as quoted above, did not define "duress" so

[8] We agree with defendant it is unclear whether the September molestation in the car followed or preceded his statement about bashing her head in.

narrowly, though the facts in that case did involve actual force during a prior molestation on the same occasion. (170 Cal.App.3d at pp. 48, 51.) Since we disagree that evidence of prior force is a prerequisite to establishing duress, it follows that evidence of a pattern of physical abuse is unnecessary.

Defendant contends, as in *People* v. *Hecker, supra,* 219 Cal.App.3d at page 1250, there is no evidence that if the victim was afraid of him, he knowingly took advantage of this fear to molest her. This contention improperly assumes a molestation cannot be accomplished by duress unless the molester knows why the victim is submitting. In any event, how could defendant have failed to recognize that the victim was afraid to resist his advances when, by his own testimony, she was often physically stiff and rigid? Defendant acknowledged the first molestation set the stage for later molestations. The first one involved a threat to hit her if she resisted and other threats to hurt her and break up the family unit if she told. We regard such threats from a parent to a reluctantly participating 14-year-old child, underlined by physical control during later molestations, as ample evidence the later molestations were accomplished by duress.[9] (*People* v. *Sanchez* (1989) 208 Cal.App.3d 721, 747-748 [256 Cal.Rptr. 446]; *People* v. *Bergschneider, supra,* 211 Cal.App.3d at p. 154.)

### B. Adequacy of instructions

■ Defendant contends the trial court erred by not instructing the jury sua sponte to find he specifically intended to commit each offense by "force, violence, duress, menace, or fear of immediate and unlawful injury."

This element of the various offenses does not require a specific intent. It describes types of intimidating conduct by the defendant and not any particular state of mind of the defendant. Forcible oral copulation does not require a specific intent. (*People* v. *Muniz* (1989) 213 Cal.App.3d 1508, 1517 [262 Cal.Rptr. 743].) The only specific intent involved in lewd touching is that it be done "with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of the child." (§ 288, subd. (a).) The only specific intent involved in foreign object penetration is "the purpose of sexual arousal, gratification, or abuse." (§ 289, subd. (a).) The jury was properly instructed regarding the specific intent involved in these crimes. (CALJIC Nos. 10.10, 10.42.)

### 4. Instruction to view admissions with caution

■ Defendant contends the trial court erred in instructing the jury to view his admissions with caution.

---

[9]This conclusion obviates the need to consider evidence cited by the People of the victim overhearing defendant's arguments with his wife.

Defense counsel argued defendant was forthright in admitting to his wife, the bishop, and the police that he had molested his daughter. His statements were consistent and did not describe force or duress.

The jury was instructed in terms of CALJIC No. 2.71 (1988 version): "An admission is a statement made by the Defendant other than at his trial which does not, by itself, acknowledge his guilt of the crimes for which such defendant is on trial but which statement tends to prove his guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the Defendant made an admission and, if so, whether such statement is true in whole or in part. . . . [¶] Evidence of an oral admission of the Defendant should be viewed with caution."

Defendant contends this instruction caused the jury to view with caution statements on which his defense relied. However, defendant relied on his prior statements to exculpate, not incriminate, himself. Some statements may be both exculpatory and incriminatory, such as defendant's acknowledgments of molestation without mention of force or duress. While such a statement tends to prove his guilt of a sex crime, it tends to prove his innocence of employing force or duress. Juries understand that this instruction by its terms applies only to statements tending to prove guilt, not to exculpatory ones. To the extent a statement is exculpatory it is not an admission to be viewed with caution. (*People v. Vega* (1990) 220 Cal.App.3d 310, 317-318 [269 Cal.Rptr. 413].) There was no error in giving this instruction.

## 5. Threat to kill a child

Defendant contends the trial court erred in allowing his cross-examination and his wife's rebuttal regarding a telephone conversation on September 11, 1989, during which he threatened to kill one of their children if she did not come home. Defendant contends this evidence was more prejudicial than probative.

On direct examination, defense counsel steered clear of any telephone conversations on September 11 before defendant picked the victim up at the pizza parlor. Defendant did testify that he had encountered his wife at home around 3 p.m. and they had a few words. Later the bishop came over and the three of them talked. He wanted to pick the victim up so she could talk to her mother. He made two phone calls while driving the victim around to see who was still at his house and to let his wife know what was going on. Although

counsel limited his questions about threats to particular molestations, defendant categorically denied ever using threats at least three times during direct examination.[10]

Over defendant's objection that the evidence was irrelevant and inflammatory, the court ruled that his testimony had opened the door for impeachment by cross-examination and rebuttal about his afternoon telephone threat to kill one of the children if his wife did not return home.

The prosecutor did not mention this threat in opening argument. Defense counsel argued the threat was both hollow and irrelevant. In closing the prosecutor argued: "We know what type of person [defendant] is, because [defendant]—when [his wife] wouldn't bring [the victim] back, [defendant] told her if she didn't bring [the victim] back in thirty minutes he would kill one of the children. [¶] Who do you think is telling the truth about hitting people and being violent? A man who would call up and threaten to kill one of his children or the child that has been the victim of violent sexual conduct and the wife who told you about his violent conduct."

Defendant contends this threat was irrelevant because "[w]hether or not [he] threatened to hurt one of the other kids had no probative value to any disputed issue at trial." We agree the prosecution's case could have been proved without evidence that defendant had threatened to kill one of his children other than the victim. ■ "Proper rebuttal evidence is restricted to that made necessary by the defendant's case ' "in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt. [Citations.] A defendant's reiterated denial of guilt and the principal facts that purportedly establish it does not justify the prosecution's introduction of new evidence to establish that which defendant would clearly have denied from the start." ' (*People* v. *Thompson* (1980) 27 Cal.3d 303, 330 . . . .)" (*People* v. *Mendibles, supra,* 199 Cal.App.3d at p. 1302.)

However, "[r]ebuttal testimony . . . may be proper when it is offered as impeachment to meet evidence on a point put in dispute, i.e., specific statements of fact to which the defense has testified." (*People* v. *Mendibles, supra,* 199 Cal.App.3d at p. 1302; cf. *People* v. *Westek* (1948) 31 Cal.2d 469, 476 [190 P.2d 9].) ■ Defendant's answers on direct examination put in issue whether he had ever used force or threats. It was proper to impeach his categorical, blanket denials of threats with evidence of a threat made the same day he denied having threatened the victim with bashing her head and

---

[10] For example when questioned about the molestation in the car, counsel asked: "Did you use any force or any threats at the time that you did that?" Defendant answered: "I never used any force or threats."

hurting her if she did not act sexy. (31 Cal.2d at pp. 476-480; *People* v. *Whitehorn* (1963) 60 Cal.2d 256, 263 [32 Cal.Rptr. 199, 383 P.2d 783]; *People* v. *Lankford* (1989) 210 Cal.App.3d 227, 240 [258 Cal.Rptr. 322].) The evidence of defendant's threat was probative of his credibility as a witness. (Evid. Code, § 780, subd. (i).)

We recognize that a threat to kill one's own child is potentially prejudicial, as defendant argues, but its probative value was at least equally strong. Evidence that defendant lied on the witness stand about ever using threats undermined his credibility on a key issue in the case, namely whether he threatened the victim in connection with molesting her. The trial court did not exceed its discretion in admitting this rebuttal evidence. (Evid. Code, § 352.)

Defendant also contends the trial court erred in failing to instruct the jury sua sponte on the limited purpose of this evidence. The court was not required to give an unrequested limiting instruction. (*People* v. *Tucciarone* (1982) 137 Cal.App.3d 701, 708 [187 Cal.Rptr. 159].)

### 6. Counts nine and ten

#### A. Double punishment

Defendant contends he could not be punished separately for the oral copulations underlying counts nine and ten, as the prosecution recognized in its written sentencing proposals.

Section 654 provides "[a]n act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ." This statute's "protection has been extended to cases in which there are several offenses committed during 'a course of conduct deemed to be indivisible in time.' (*People* v. *Beamon* (1973) 8 Cal.3d 625, 639 . . . .)" (*People* v. *Harrison* (1989) 48 Cal.3d 321, 335 [256 Cal.Rptr. 401, 768 P.2d 1078].)

Defendant misplaces reliance on this court's decision in *People* v. *Bevan* (1989) 208 Cal.App.3d 393 [256 Cal.Rptr. 233]. *Bevan* did not involve section 654. It involved the related, but separate, issue of "fragmenting a single, brief course of lewd and lascivious conduct into separate offenses . . . ." (*Id.* at p. 403.) This court concluded under the circumstances each lewd touch not amounting to a separate sex crime was not a separate offense. (*Ibid.*)

Multiple, repeated sex crimes have not been regarded as a single course of conduct under section 654. (*People* v. *Perez* (1979) 23 Cal.3d 545, 553-554 [153 Cal.Rptr. 40, 591 P.2d 63]; *People* v. *Harrison, supra,* 48 Cal.3d at pp. 335-336.) Multiple digital-vaginal penetrations during a single encounter may be separately punished (*People* v. *Harrison, supra,* 48 Cal.3d at pp. 337-338) as may be multiple oral copulations (*People* v. *Reeder* (1984) 152 Cal.App.3d 900, 917 [200 Cal.Rptr. 479]). As the People succinctly put it, "The prosecutor was wrong; the court was right."

### B. Kidnapping enhancements

■ Defendant contends he, as a parent entitled to custody of the victim, could not have kidnapped his own daughter.

On counts nine and ten, the jury found true the charge that defendant kidnapped the victim for the "purpose of committing the sexual offenses stated therein."[11] As the jury was instructed, kidnapping involves "[f]irst, a person was unlawfully compelled to move because of a reasonable apprehension of harm; second, the movement of such person was caused with the specific intent to commit that crime and the person causing such movement had such specific intent to commit that crime when the movement commenced . . . ."

*Wilborn* v. *Superior Court* (1959) 51 Cal.2d 828 [337 P.2d 65], recognized "the general rule: 'In the absence of an order or decree affecting the custody of a child, it is generally held that a parent, . . . does not commit the crime of kidnapping by taking exclusive possession of the child.'" (*Id.* at p. 830.) This statement was dictum as the defendant there was not the parent and was charged with child-stealing (§ 278), not kidnapping (§ 207). (51 Cal.2d at p. 829.) The dictum was followed in *Cline* v. *Superior Court* (1982) 135 Cal.App.3d 943 [185 Cal.Rptr. 787], which held that neither kidnapping nor child-stealing charges were sustainable against a parent with legal custody of his child. (*Id.* at p. 945.) The court reasoned: "As stated by *People* v. *Oliver* (1961) 55 Cal.2d 761, 768 . . . : 'Penal Code, section 207, as applied to a person forcibly taking and carrying away another, who by reason of immaturity or mental condition is unable to give his legal consent thereto, should, . . . be construed as making the one so acting guilty of kidnaping only if the taking and carrying away is done for an illegal purpose or with an illegal intent.' So construed, petitioner's coequal right to custody defeats any allegation of kidnaping by providing a legal purpose and intent." (*Id.* at pp. 947-948.)

---

[11] Defendant also challenges the enhancement on count seven, overlooking that it was found not true.

We agree with the People that, while a father entitled to custody ordinarily cannot kidnap his own child, his right to physical custody ends when he exercises it for a purpose known to be illegal. After *Wilborn* in dictum acknowledged the general rule that a parent cannot kidnap his or her child, *Oliver* gave section 207 the above quoted limiting construction focussing on the alleged kidnapper's illegal purpose. Defendant contends if parental kidnapping depended on a parent's illegal purpose, *Cline* would have reached a different conclusion about its kidnapping charge because the father there had the illegal intent of child abuse. The court held the father was subject to liability for child abuse (§ 273a) for manhandling his son while taking him from his mother. (135 Cal.App.3d at p. 949.) No arguments were made in *Cline* that the father intended to abuse his son or that such an intent could subject him to liability for kidnapping. Cases are not authority for propositions they do not discuss. (*In re Tartar* (1959) 52 Cal.2d 250, 258 [339 P.2d 553].)

We recognize the general rule is that a parent entitled to custody cannot be liable for kidnapping his or her own child. (Annot. (1983) 20 A.L.R.4th 823, § 3, pp. 828-830.) However, we are persuaded that such a parent is liable for kidnapping if he or she exercises custodial rights for an illegal purpose. (Cf. *State* v. *Tuitasi* (1986) 46 Wash.App. 206 [729 P.2d 75, 77].) Thus, defendant became liable for kidnapping his own daughter when he took her into a motel room in order to molest her.

### C. *Fully consecutive sentences*

Defendant contends the court erred in failing to state reasons for imposing fully consecutive terms on counts nine and ten.[12]

*People* v. *Belmontes* (1983) 34 Cal.3d 335 [193 Cal.Rptr. 882, 667 P.2d 686], teaches that when a court exercises its discretion to impose a full consecutive term under section 667.6, subdivision (c),[13] the court ideally should explain choosing consecutive rather than concurrent and full rather than subordinate, though the same reason may justify both choices. At a minimum the record must reflect a recognition that two sentence choices are involved. (34 Cal.3d at p. 348.)

Here, after the court sentenced defendant to seven fully consecutive mitigated three-year terms on counts one through seven pursuant to section

---

[12]While the caption in defendant's opening brief also refers to count seven, the text reveals the argument is directed at counts nine and ten.

[13]Section 667.6, subdivision (c), provides in relevant part: "In lieu of the term provided in Section 1170.1, a full, separate, and consecutive term may be imposed for . . . committing . . . oral copulation in violation of Section . . . 288a by force, violence, duress, menace, or fear of immediate and unlawful bodily injury . . . ."

667.6, subdivision (d), and stayed the term on count two pursuant to section 654, the court stated: "On Counts Nine and Ten, the Court views that the activity and the conduct of the Defendant with regard to Counts Nine and Ten is the most egregious in this case, it was the activity concerned at the time that the Defendant was driving the victim around in the car, and the Jury had found the kidnapping allegation true, and the activity in the motel room, which the Court felt was the most serious conduct of this Defendant. [¶] In Counts Nine and Ten, the Court is going to, because of the seriousness of the offenses and because of the—because of the kidnapping involved, the Court is going to impose the mitigated—excuse me, the midrange as to Counts Nine and Ten. I am going to run Count Ten consecutive to Count Nine because I had not used that factor in aggravation before and that is a factor pursuant to [Cal. Rules of Court, rule] 421(a)(2), Defendant taking advantage of a position of trust or confidence to commit the crimes. [¶] So as to Count Nine, the Court imposes a midrange of six years. And to that the Court adds three years pursuant to 667.8(a), the kidnapping allegation for a nine year term in Count Nine. [¶] And as to Count Ten, the Court imposes the midrange of six years consecutive for the reason aforesaid. Three years is imposed pursuant to 667.8(a) kidnapping allegation, however stayed, since I used it in Count Nine. [¶] So the term imposed in Count Ten would be six years."

Three days later, the court called the case back for the following clarification of sentencing. "I do wish to state that I am exercising my discretion pursuant to 667.6(c) in lieu of the provisions of the Section 1170.1. And specifically as to Counts Nine and Ten, the Court is sentencing the Defendant pursuant to 667.6(c). And for the reasons I stated the other day, these will be consecutive terms, consecutive to the terms imposed before and consecutive to each other."

The People concede the court gave a reason only for a consecutive term, but not a full term. ▄▄▄ The People contend the error was harmless since the court recognized its choice to sentence under section 667.6, subdivision (c), and it could have given the same reason for this choice as for imposing consecutive sentences. We question whether a *Belmontes* error can be harmless. *People* v. *Coleman* (1989) 48 Cal.3d 112 [255 Cal.Rptr. 813, 768 P.2d 32], relied on by defendant, remanded without a harmless error analysis where a trial court recognized its discretion under section 667.6, subdivision (c), but failed to state reasons. (48 Cal.3d at pp. 161-162; cf. *People* v. *James* (1989) 208 Cal.App.3d 1155, 1166-1167 [256 Cal.Rptr. 661].) In *People* v. *Fernandez* (1990) 226 Cal.App.3d 669 [276 Cal.Rptr. 631], this court refused to render harmless a trial court's insufficient explanation for full consecutive sentences by providing possible reasons on appeal. This court

recognized a criminal defendant is not afforded a meaningful appellate review of sentencing reasons when the appellate court provides the reasons. (*Id.* at p. 684.)

## 7. *Disposition*

The judgment is reversed and remanded for resentencing.

Agliano, P. J., and Bamattre-Manoukian, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 16, 1992.