Filed 8/31/16  P. v. Ramirez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B265697 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.VA132374) |
| v. | |
| ENRIQUE SEBASTIAN RAMIREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Raul Anthony Sahagun, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Enrique Ramirez appeals from his conviction by jury on seven counts of forcible lewd acts upon a child. He contends there was insufficient evidence that he used force or duress. He also argues that the trial court improperly imposed a multiple victim enhancement to all of his counts. We affirm.

## PROCEDURAL HISTORY

The Los Angeles County District Attorney (the People) filed an amended information on June 16, 2015 charging defendant with seven counts of forcible lewd acts upon a child 14 years old or younger pursuant to Penal Code section 288, subdivision (b)(1).[1] The People alleged that defendant committed all counts against his two nieces—counts 1 through 3 alleged acts against V.C. between 1995 and 1997 and counts 4 through 7 alleged acts against A.C. between 2001 and 2009.[2] The information further alleged as to all counts that defendant committed the offenses on more than one victim within the meaning of sections 1203.066, subdivision (a)(7) and 667.61, subdivisions (b) and (e).

On June 18, 2015, a jury found defendant guilty on all counts and found the multiple victim allegations true. The court sentenced defendant to consecutive terms of 15 years to life on each count, for a total sentence of 105 years to life.

Defendant timely appealed.

## FACTUAL BACKGROUND

### I.    Prosecution Evidence

#### A.    *V.C.'s testimony*

V.C. was 27 years old at the time of trial. She has two younger siblings, a brother and a sister, A.C. Defendant, her uncle, is married to her maternal aunt. V.C. first met

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] Section 288, subdivision (b) was renumbered as section 288, subdivision (b)(1) by amendment in 1995. (Stats. 1995, ch. 890, §1, p. 6777.) For the sake of consistency, we refer to both former subdivision (b) and current subdivision (b)(1) herein as "section 288(b)(1)."

defendant when she was about seven years old, while he was dating her aunt. He would pick up the children and drive them to the park, the pool, and the beach.

V.C. testified that defendant would place her on his lap while driving home from these outings, ostensibly to let her pretend to drive the car. Her brother sat in the back seat; there were never any other adults in the car. These incidents made V.C. uncomfortable. Defendant would start to breathe heavily (which she later recognized as a sign of arousal) and would place her on his lap "a certain way that other uncles wouldn't." She recalled "a lot of movement," where defendant would move her body around on his lap and would move his body "more down on the seat" and then would "kind of pick his body up." Defendant would move his hands from V.C.'s waist to touch her thighs, in between her legs, and then her vagina over her clothes. As she described it, he would use the pretense of adjusting their position in the seat to move his hands around and would not leave them in any spot for more than a few seconds at a time.

This conduct occurred on multiple occasions. V.C. testified that she "didn't know what to feel. I felt embarrassed I guess. I felt weird. I . . . knew it wasn't right. . . . I felt disgusting. I felt nasty because I didn't know that I was supposed to say no. Or I didn't know how to say no. . . . I kind of like felt like maybe it's okay or I'm not sure. I wouldn't know how to." When defendant did not stop, V.C. would try to get off his lap and defendant would let her off. She did not recall either of them saying anything during these incidents.

V.C. also described instances where her grandmother, who was watching her and her brother, would leave them in defendant's care while she ran errands. The three of them would "play fight" in defendant's living room. On multiple occasions, defendant would pick V.C. up, throw her on the couch, and climb on top of her. He would also throw her on top of her brother. In picking her up, defendant would put his hand between her legs and touch V.C.'s vagina, but "pretend[] he didn't know he was touching me down there." He would hold her down and lie on top of her, touching her with his legs and penis, under his clothing. Defendant also would be breathing heavily during this conduct.

3

V.C. testified that she became angry at her brother because he refused to stop playing with defendant, and defendant would say "let him play." As a result, she continued to engage in the play fighting with defendant because she "wanted to protect" her brother and because she "knew what [defendant] was going to do" to her brother. V.C. would "throw" herself in front of her brother and "defend" him, so that defendant would not touch him.

The conduct stopped when V.C. was about eight years old. She did not tell anyone at the time because she felt "embarrassed and disgusting. I felt like I allowed him to do it, and I was the one to blame too. I felt guilty for letting him do it."

V.C. finally disclosed the abuse in 2013, when she was about 25 years old. She was in therapy at the time and first told her therapist, and then her mother about a week later.

B.     *A.C.'s testimony*

A.C. was 18 years old at the time of trial. Defendant was her godfather and she had known him her entire life. A.C. testified that defendant "was like a father figure" to her. From the time she was a baby, she would stay at her grandmother's house during the day while her parents were at work. Defendant and his family lived in the house behind her grandmother's house. Defendant's son, A.C.'s cousin, was a year younger than she was and the two children were close friends. A.C. testified that she would spend a lot of time with defendant and his family, including family trips to Disneyland. Defendant spoiled her, giving her ice cream and fast food whenever she wanted.

A.C. testified that when she was five years old, defendant began touching her "private parts" over her clothing. She would go to defendant's house to play with her cousin, and defendant would "grab me and like sit me down on top of him" and touch her chest and vagina over her clothes. When she was six or seven years old, defendant began to touch her under her clothing as well. A.C. testified that defendant would lie down next to her on the bed and put his hand under her pants and underwear to touch her. When A.C. was seven years old, defendant's conduct escalated. One day, while she was in defendant's house, he grabbed her, laid her on her back on the floor, took off her

4

underwear, put her legs up against his chest, and penetrated her anus with his penis. Defendant then got up and went to the restroom, acting "like nothing happened." A.C. returned to her grandmother's house. She testified that she felt "horrible," and tried to defecate but could not, and that it "hurt a lot" for five to ten minutes. This happened at least five times, always in the same manner.

Defendant also made A.C. give him oral sex, starting when she was about seven years old. Typically, this would occur when A.C. was in defendant's house playing video games with her cousin. Defendant would come out of the shower wearing a towel and would sit down on the bed. He would "kind of direct me to come over" to where he was sitting on the bed. During these incidents, A.C.'s cousin was sitting on the floor playing video games, about eight feet away. Defendant would get under the covers, take out his penis, and then grab A.C. and move her head toward his penis until it was touching her mouth and she "kind of knew to open it." Defendant would place his hands on A.C.'s head, moving her head. Afterward, defendant would return to the restroom. A.C. testified that she did not understand what was going on at the time, but she "felt gross." This happened approximately three times. Defendant's son witnessed one incident and told their grandmother, but when she asked A.C. about it, A.C. denied it because she was "scared." As A.C. explained, "I didn't want anybody to know what was going on. I felt horrible. I thought they would blame it on me for what was going on."

Defendant's conduct continued until A.C. was twelve years old. On the last occasion, A.C. was spending time in defendant's house playing with defendant's son and another cousin after school. When defendant came out of the shower, A.C. was on the bed looking at her phone and her cousins were playing inside a makeshift fort they had built. Defendant came over to the bed, took off his towel and laid down naked. A.C. testified that she was also naked, but she did not recall how she ended up that way. Defendant began touching her private parts and masturbating. The incident lasted about ten minutes. The boys remained in the fort the entire time, about 15 feet away.

A.C. testified that defendant "never threatened" but he would tell her "I can't wait until you get older so I can marry you and I can divorce your [aunt] so I could be with

5

you." She was eight or nine years old at the time and it frightened her because she thought " he was going to kidnap me. I was so scared to turn 18 because I knew he was going to do something to me." A.C. also stated that she never told anyone because "I was scared. I didn't want to break the family apart." She was really close to her cousin (defendant's son) and her father was "best friends" with defendant.

C.      *V.C. and A.C.'s Mother*

V.C. and A.C.'s mother testified that V.C. was nervous and crying when she disclosed the touching by defendant. Her mother then asked A.C. if one of her uncles had touched her, and reported what V.C. had said. A.C. started crying and told her mother about the abuse by defendant. V.C., A.C., and their mother then decided to report the incidents to the police.

D.      *Defendant's statement and letter*

After the victims reported the abuse to the police in 2013, defendant came to the police station and agreed to an interview. Two detectives interviewed defendant in Spanish. Portions of the recorded interview were played for the jury and it was  provided with a translated transcript.

At the start of the interview, one of the detectives informed defendant he was not under arrest and could leave whenever he wanted. Defendant said he got along well with both V.C. and A.C. and that he had treated A.C. "like my daughter since she was little. I've always taken care of her, everything." He said that perhaps he got "confused a lot also because I was always with her whenever and everything."

The first time sexual contact occurred when A.C. was about six years old. According to defendant, he was in the bathtub in his home and A.C. got on top of him and "began to move . . . as if we were having sex." He asked her who had touched her and she responded "No, well nobody." Defendant also admitted he put his penis "on her butt" about four times total, beginning when A.C. was about six years old. It happened in his room on the bed. Defendant said perhaps A.C. was confused or they both were confused regarding "the affection that the two of us had," but A.C. "always would come to me." Defendant then admitted he "was in love with that little girl."

6

Defendant stated that he would put his penis "on her butt . . . [j]ust to become aroused," but he "wouldn't penetrate her." After he did so, he would "go and masturbate in the bathroom." He also admitted touching A.C.'s vagina over her clothes.

Defendant said he told A.C. "This has to stop my child, it's [sic] can't go on." A.C. would respond, "'You're the adult.'" The last time he was with A.C. she was 13 years old and "I told her, Not me my child, no, no." He "realized that it was wrong and I told her, That's it, that has to stop." According to defendant, during the final incident, A.C. took off her clothes, he hugged her, and he put his penis on her butt.

Defendant denied ever touching V.C.

During his interview, the detectives asked defendant if he wanted to write a letter to A.C. to "explain everything" and ask her forgiveness. Defendant agreed. The letter was introduced at trial. In it, defendant referred to A.C. as "my child" and said he wanted to ask her "forgiveness for everything that happened." Defendant stated he felt "very bad" and that he "made a mistake," but that it was "never going to happen again."

## II.     Defense Evidence

Defendant did not testify and presented no evidence in his defense.

### DISCUSSION

## I.     Lewd Acts by Force or Duress

Defendant contends there was insufficient evidence to establish that he engaged in forcible lewd conduct as to either V.C. or A.C. We disagree.

### A.     Governing Principles

In reviewing a claim of insufficient evidence, the proper test is "'whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Moreover, "'[a]lthough we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the

7

facts on which the determination depends. [Citation.]'" (*Ibid*.) Thus, "[i]f the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.)

## B. Defendant's Motion During Trial

Following the close of evidence, defendant moved for a judgment of acquittal pursuant to section 1118.1. Defendant's counsel argued that there was insufficient evidence of force or duress to support a conviction under section 288(b)(1). The court found there was "strong evidence" in support of the charges regarding A.C. The court acknowledged that the evidence of force or duress related to V.C. was "not as strong" and was "close," but denied the motion, citing *People v. Cicero* (1984) 157 Cal.App.3d 465 (*Cicero*), disapproved on other grounds by *People v. Soto* (2011) 51 Cal.4th 229, 241 (*Soto*).

## C. Analysis

Defendant argues, as he did below, that there was insufficient evidence to establish that he acted with the force or duress required under section 288(b)(1). Section 288, subdivision (a) prohibits the commission of a "lewd or lascivious act" on a child under age 14 "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires" of the perpetrator or the child. Section 288(b)(1) prohibits the commission of the same act "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person. . . ." A conviction under section 288(b)(1) carries increased penalties over a conviction under section 288, subdivision (a). (See §§ 288, subds. (a), (b)(1)[longer terms]; 1203.066, subd. (a)(1) [ineligible for probation]; 667.6, subds. (c), (d) [consecutive sentencing].)

The "force" required under section 288(b)(1) must be "substantially different from or substantially greater than that necessary to accomplish the lewd act itself." (*Cicero, supra*, 157 Cal.App.3d at p. 474; see also *Soto, supra*, 51 Cal.4th at p. 242 [approving *Cicero* formulation as "an appropriate definition of the force required"].) Since the

8

articulation of this standard in *Cicero*, the majority of courts has found sufficient force based on acts by defendant including carrying, restraining, and grabbing the victim. (See, e.g., *Cicero, supra*, 157 Cal.App.3d at p. 474 [carrying]; *People v. Cochran* (2002) 103 Cal.App.4th 8, 13 (*Cochran*), disapproved on other grounds in *Soto, supra*, 51 Cal.4th at p. 248 ["if the defendant grabs or holds a victim who is trying to pull away, that is use of physical force above and beyond that needed to accomplish the act"]; *People v. Neel* (1993) 19 Cal.App.4th 1784, 1790, disapproved on other grounds in *Soto, supra*, 51 Cal.4th at p. 248 ["defendant's acts of forcing the victim's head down on his penis when she tried to pull away and grabbing her wrist, placing her hand on his penis, and then 'making it go up and down' constitute force] disapproved on other grounds in *Soto, supra*, 51 Cal.4th at p. 248; *People v. Pitmon* (1985) 170 Cal.App.3d 38, 48 (*Pitmon*), disapproved on another ground in *Soto, supra*, 51 Cal.4th at p. 248, fn. 12 [pushing victim's back to facilitate oral sex on defendant].)

In *Cicero, supra*, 157 Cal.App.3d at pp. 469-470, for example, the defendant approached two girls, ages 11 and 12, and engaged them in conversation near a waterway. When the girls pretended to throw each other into the water, the defendant suggested he would throw them both in. (*Id*. at p. 470.) The defendant then "picked up the girls by the waist, one under each arm," and carried them for about nine seconds. (*Ibid*.) As he did so, he "moved his hands between their legs." (*Ibid*.) The girls laughed and made no attempt to get away, believing the touching was accidental and that the defendant "was playing a game." (*Ibid*.) After carrying them for 15 to 20 feet, the defendant sat but continued to hold each girl around the waist. (*Ibid*.) When one of the girls told him she was getting scared and needed to go home, the defendant responded he would let them go if she gave him a kiss. (*Ibid*.) She complied, the defendant attempted to kiss her again, and the girls were able to slip from his grasp and run away. (*Ibid*.)

After articulating the standard as a matter of first impression, the Court of Appeal concluded that the force requirement of section 288(b)(1) was "doubly met: defendant's acts of picking the girls up and carrying them along were applications of physical force

9

substantially different from *and* substantially greater than that necessary to accomplish the lewd act of feeling their crotches." (*Cicero, supra*, 157 Cal.App.3d at p. 474.)

Similarly, in *Pitmon, supra*, 170 Cal.App.3d at pp. 44–45, the defendant grabbed the eight-year-old victim's hand, placed it on his own genitals, and rubbed himself with the victim's hand. The defendant also "slightly pushed [the victim's] back" as the boy orally copulated him. (*Id*. at p. 48.) The appellate court concluded that the defendant's "manipulation of [the victim's] hand as a tool" and his pushing the victim's back "displayed a use of physical force that was not necessary for the commission of the lewd acts." (*Ibid*.)

Here, turning first to V.C., the trial court relied on *Cicero* in support of its conclusion that defendant's acts were similarly forceful and therefore sufficient for a conviction under section 288(b)(1). We agree. V.C. testified that on multiple occasions when she was seven or eight years old, defendant would pick her up, touching her vagina as he did so, throw her onto the couch, and climb on top of her. He would then hold her down and she would feel his penis against her body. During the incidents in the car, defendant would place her on his lap, hold her by the waist and move his body underneath her, as well as move her around on his lap, repeatedly touching her vagina over her clothes as he did so. Defendant's acts of picking V.C. up, holding her down on the couch, and moving her around on top of his lap in the car involved uses of physical force substantially different and/or substantially greater than that necessary to accomplish the lewd touching.

Similarly, A.C. testified that defendant would "grab" her and sit her on his lap and then touch her chest and vagina. As the conduct escalated, defendant would grab A.C., lay her on the floor and lean against her legs in order to penetrate her with his penis. In addition, A.C. described several instances where defendant would grab her, put his hands on her head, and move her head until her mouth was touching his penis and she opened her mouth. This conduct by defendant displayed the requisite level of force for purposes of section 288(b)(1).

Defendant does not address or attempt to distinguish *Cicero*, despite the similarity of the conduct there to defendant's conduct against V.C., and despite the trial court's reliance on it in denying his motion for acquittal. Instead, he cites to V.C.'s testimony that defendant would allow her to get off his lap when she tried to do so and argues that there was no "additional or gratuitous contact" beyond the lewd touching itself. We are not persuaded. Both victims testified consistently regarding defendant's acts of grabbing, holding, and physically manipulating their bodies. We conclude these acts went substantially beyond the physical contact inherent in the lewd touching itself.

Defendant also cites, without discussion, two contrary opinions by the same panel of the Sixth District, *People v. Schulz* (1992) 2 Cal.App.4th 999, 1004 (*Schulz*) and *People v. Senior* (1992) 3 Cal.App.4th 765, 774 (*Senior*), for the proposition that "a modicum of holding and even restraining cannot be regarded as substantially different or excessive 'force.'"[3] In *Schulz*, the defendant tried to get the victim off her bed by grabbing her arm. (*Schulz, supra*, 2 Cal.App.4th at pp. 1003-1004.) When the victim ran to a corner of her room, the defendant grabbed and held her arm, then touched her breasts and vaginal area. (*Ibid*.) The Court of Appeal found that conduct to be insufficient force, reasoning that "[s]ince ordinary lewd touching often involves some additional physical contact, a modicum of holding and even restraining cannot be regarded as substantially different or excessive 'force.'" (*Id*. at p. 1004.)

In *Senior*, the victim tried to pull away from defendant as he orally copulated her, but he "pulled her back." (*Senior, supra*, 3 Cal.App.4th at p. 771.) She also tried to pull away as he made her orally copulate him, but he held her shoulders. (*Ibid*.) Citing *Schulz*, the court held: "We . . . do not regard as constituting 'force' the evidence that defendant pulled the victim back when she tried to pull away from the oral copulations. . . . Since

---

[3] Defendant also incorrectly cites *Pitmon, supra*, 170 Cal.App.3d at p. 48, as concluding there was "no force in grabbing/holding victim's arm while fondling." To the contrary, as discussed herein, the court in *Pitmon* expressly found that "[t]here can be little doubt that defendant's manipulation of [the victim's] hand as a tool to rub his genitals was a use of physical force beyond that necessary to accomplish the lewd act." (*Ibid*.)

11

ordinary oral copulation and digital penetration almost always involve some physical contact other than genital, a modicum of holding and even restraining cannot be regarded as substantially different or excessive 'force.' There was no evidence here of any struggle, however brief. [Citation.]" (*Id*. at p. 774.)[4]

Subsequently, courts have declined to follow *Schulz* and *Senior* and have criticized their analysis of the requisite level of force. As the court stated in *People v. Babcock* (1993) 14 Cal.App.4th 383, 388, "the fatal flaw in . . . the analyses in *Schulz* and *Senior*, is in their improper attempt to merge the lewd acts and the force by which they were accomplished as a matter of law. Unlike the court in *Schulz*, we do not believe that holding a victim who was trying to escape in a corner is necessarily an element of the lewd act of touching her vagina and breasts. Unlike the court in *Senior*, we do not believe that pulling a victim back as she tried to get away is necessarily an element of oral copulation." The *Babcock* court then concluded that there was sufficient evidence of force when the defendant grabbed the victim's hand, touched his crotch with it, and then pulled her hand back when she tried to pull away; the court held these acts were not "necessarily elements of the lewd acts of touching defendant's crotch." (*Id*. at pp. 385, 388.)

Numerous courts have followed *Babcock's* reasoning and rejected *Schulz* and *Senior*. (See, e.g., *People v. Neel*, *supra*, 19 Cal.App.4th at p. 1790 ["A defendant may fondle a child's genitals without having to grab the child by the arm and hold the crying victim in order to accomplish the act. Likewise, an assailant may achieve oral copulation without having to grab the victim's head to prevent the victim from resisting."]; *People v. Bolander* (1994) 23 Cal.App.4th 155, 160-161 disapproved on other grounds in *Soto*, *supra*, 51 Cal.4th at p. 248; *People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005.) We will do the same. Defendant's acts, including picking up and holding down a seven-year-old child, and grabbing the head of another seven-year-old child for purposes of bringing

_____

[4] Both the *Schulz* and *Senior* courts ultimately affirmed the convictions based on a finding of duress. (*Schulz, supra*, 2 Cal.App.4th at p. 1005; *Senior, supra*, 3 Cal.App.4th at p. 775-776.)

her mouth in contact with his penis, are not necessary to achieve the lewd conduct at issue. Accordingly, there was sufficient evidence to support the jury's conclusion that defendant committed forcible lewd conduct against both V.C. and A.C. within the meaning of section 288(b)(1).

In addition, even assuming defendant's acts were insufficient to establish force, they were certainly sufficient to meet the requirements of duress. "Duress" in this context means "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (*Pitmon, supra*, 170 Cal.App.3d at p. 50.) "The total circumstances, including the age of the victim, and [her] relationship to defendant are factors to be considered in appraising the existence of duress." (*Id*. at p. 51.) Defendant's "physical control" of the victim is also relevant. (*Schulz, supra*, 2 Cal.App.4th at p. 1005.) Moreover, "[t]he fact that the victim testifies the defendant did not use force or threats does not require a finding of no duress; the victim's testimony must be considered in light of her age and her relationship to the defendant." (*Cochran, supra,* 103 Cal.App.4th at p. 14.)

Here, the totality of the circumstances supports a finding of duress. In addition to the physical control exhibited by defendant discussed above, both victims were between five and eight years old and physically much smaller than defendant. They had a close familial relationship with defendant, their uncle; in fact, A.C. testified that defendant was like a father to her, and defendant confirmed he had raised A.C. "like my daughter since she was little." The conduct was repeated over the course of several years and largely took place in defendant's home, where the girls spent significant time, and often when defendant was the only adult and authority figure present. Under these circumstances, we conclude there was sufficient evidence to support a finding of duress as to both V.C. and A.C. (See, e.g., *Cochran, supra*, 103 Cal.App.4th at p. 16, fn. 6 ["as a factual matter, when the victim is as young as [nine years old] and is molested by her father in the family home, in all but the rarest cases duress will be present"]; *People v. Sanchez* (1989) 208

13

Cal.App.3d 721, 747-748 [duress found where defendant molested eight-year-old granddaughter repeatedly over a three-year period and victim viewed defendant as a father figure]; *People v. Superior Court (Kneip)* (1990) 219 Cal.App.3d 235, 239 ["Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim" is relevant to determining duress."].)[5]

## II.     Multiple Victim Enhancement

Defendant asserts that the trial court improperly imposed the multiple victim sentencing enhancement pursuant to section 667.61, commonly known as the "One Strike" law.  (See *People v. Anderson* (2009) 47 Cal.4th 92, 99.)  Section 667.61, subdivision (b) requires punishment of imprisonment for 15 years to life for conviction of "an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e)."  Forcible lewd conduct under section 288(b)(1) is a qualifying offense listed in section 667.61, subdivision (c).  The enumerated special circumstances listed in section 667.61, subdivision (e) include that "defendant has been convicted in the present case or cases of committing [a qualifying offense] against more than one victim." (§ 667.61, subd. (e)(4).)

Here, the trial court applied the multiple victim enhancement to each conviction and sentenced defendant to seven consecutive terms of 15 years to life.  Defendant contends this was error.  He argues that the enhancement should apply only once per victim and therefore should have been imposed only on his convictions on counts 1 and 4.  Defendant acknowledges that Division Five of this District reached the opposite conclusion in *People v. Valdez* (2011) 193 Cal.App.4th 1515 (*Valdez*), but he contends that case was "wrongly decided."  He cites no other authority in support of that proposition.  We reject his contention.

---

[5] We reject defendant's suggestion that this conclusion means that section 288(b)(1) "would automatically apply to all child sexual abuse performed by adult family members."  As discussed herein, the age of the victim, the relationship between the victim and the defendant, and the particular circumstances of the conduct are all factors in determining the presence of duress.

In *Valdez*, the defendant committed multiple qualifying offenses against three victims. (*Valdez, supra*, 193 Cal.App.4th at p. 1518.) The trial court sentenced him to consecutive terms of 15 years to life on four counts, two of which involved the same victim. (*Ibid*.) The defendant claimed, as defendant does here, that the One Strike law permitted only one such sentence for each victim, relying on subdivision (f) of the One Strike law and the difference between the multiple victim circumstance and the other circumstances specified in subdivision (e). (*Ibid*.)

The court concluded that the meaning of section 667.61, subdivision (f) "is unambiguous and its application is clear. When the minimum number of subdivision ... (e) circumstances are pled and proved, the sentencing court shall use them 'as the basis for imposing the term provided in subdivision [(b)] rather than . . . to impose the punishment authorized under any other law, unless another law provides for a greater penalty.'" (*Valdez, supra*, 193 Cal.App.4th at p. 1522.) Thus, nothing in subdivision (f) "even hints at an intent to limit" the imposition of One Strike terms "based on the multiple victim circumstance. Rather, it evinces the intent to ensure the greatest possible punishment under that sentencing scheme." (*Id*. at p. 1523.)

Similarly, the *Valdez* court rejected defendant's argument that "the multiple-victim circumstance is different in kind from the other enumerated circumstances because all of the others refer to aggravating factors, such as kidnapping or the use of a dangerous weapon, occurring in the commission of the present offense." (*Valdez, supra*, 193 Cal.App.4th at p. 1522.) Citing *People v. Stewart* (2004) 119 Cal.App.4th 163 (*Stewart*), the court explained "why that distinction makes no difference in terms of the statute's application: 'The statutory intent and scheme of Penal Code section 667.61, subdivision (e) is not difficult to discern. Where the "present offense" against a victim is a qualifying offense and the gravity of that offense is enhanced by one of the circumstances enumerated in subdivision (e)(1), (2), (3), (4), (6), or (7), the life sentence mandated by the statute shall apply. . . .' (*Stewart, supra*, 119 Cal.App.4th at p. 171; see *People v. Murphy* (1998) 65 Cal.App.4th 35, 41-42 (*Murphy*) ['[I]n making multiple convictions for violent sex offenses punishable by multiple life sentences, the Legislature was

15

expressing the view that multiple violent sex offenses deserve more severe punishment than a single violent sex offense because of the predatory nature of the perpetrator.']).)" (*Valdez, supra*, 193 Cal.App.4th at p. 1522.)

We agree with *Valdez*. Subdivision (f) of the One Strike law, by its plain language, demonstrates the intent to ensure the greatest possible punishment for crimes subject to its enhancements; conversely, nothing within it suggests the limitation on punishment advocated by defendant. Similarly, the plain language of subdivision (e) makes no distinction in application between the multiple victim circumstance and the other enumerated circumstances. As such, the trial court correctly applied the section 667.61 enhancement to each count, involving two different victims on seven separate occasions. Nothing in the language of the statute or the applicable case law demonstrates that was error. (See also *People v. DeSimone* (1998) 62 Cal.App.4th 693, 698 [rejecting contention that multiple victim circumstance applies only once per case and noting that "[o]ffenders who strike against multiple victims are among the most dangerous"]; *People v. Wutzke* (2002) 28 Cal.4th 923, 930-931 ["The One Strike scheme [] contemplates a separate life term for each victim attacked on each separate occasion."].)

Finally, we note that section 667.61 was amended in September 2006. Defendant's offenses involved conduct committed both before and after that date. However, our conclusion remains the same regardless of which version of the statute applied. Prior to September 2006, the One Strike law contained former subdivision (g), which limited imposition of a One Strike sentence to "once for any offense or offenses committed against a single victim during a single occasion." (*People v. Rodriguez* (2012) 207 Cal.App.4th 204, 212.) Courts facing this issue under the prior version of the statute concluded that because the limitation concerned only multiple offenses against a particular victim on a particular occasion, it did not restrict the number of life sentences imposed against multiple victims or on multiple occasions. (See *Murphy, supra,* 65 Cal.App.4th at p. 40 ["'The only limitation on the number of life sentences which can be imposed is contained in section 667.61, subdivision (g). . . .'"]; *Valdez, supra*, 193 Cal.App.4th at p. 1523 [citing *Murphy*].)

16

Then, in September 2006, the Legislature amended the One Strike law to eliminate section 667.61, former subdivision (g).  (Stats. 2006, ch. 337, § 33, pp.2639-2641.)  The sole provision relevant to the sentencing of multiple offenses under the current One Strike law is section 667.61, subdivision (i), which provides:  "For any offense specified in paragraphs (1) to (7), inclusive, of subdivision (c), . . . the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions."  Forcible lewd conduct under section 288(b)(1) is included in this provision, as it is listed in paragraph (4) of section 667.61, subdivision (c).  Defendant offers no explanation how the language of this subdivision could be squared with his argument restricting imposition of consecutive One Strike sentences to one per victim, regardless of the number of occasions.

In sum, we conclude that the trial court correctly applied the section 667.61 sentencing enhancement to each of defendant's seven counts.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:


EPSTEIN, P. J.


MANELLA, J.

17
