Filed 3/26/25  P. v. Garcia CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084809 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF1900070) |
| ELIO RENE GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Jason L. Stone, Judge.  Affirmed.

Benjamin Kington, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Charles C. Ragland, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Elio Rene Garcia of sexual abuse of Mary Doe (M.D.); specifically, oral copulation of a child under age 10 (Pen. Code,[1] § 288.7, subd. (b); count 1); forcible lewd conduct on a child (§ 288, subd. (b)(1); count 2); continuous sexual abuse of a child (§ 288.5, subd. (a); count 4); and lewd acts on a child (§ 288, subd. (c)(1); count 5). It found true multiple-victim allegations (§ 667.61, subd. (e)(4)) as to counts 2 and 4. The jury found Garcia not guilty of count 3, which alleged he committed a forcible lewd act on a child (§ 288, subd. (b)(1)). The jury convicted him of five other counts against another minor.[2]

The court sentenced Garcia to a determinate term of eight years eight months in prison plus an indeterminate term of 140 years to life.

Garcia's sole contention is, "There was insufficient evidence count 2 was accomplished by force, fear or duress." We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

After marrying Garcia, M.D.'s mother and her three children, including M.D., who was eight or nine years old, moved into Garcia's house in Coachella. M.D. testified Garcia's sexual abuse started when she was nine or ten years old, and attending middle school. One of the first incidents occurred in their house's storage room; he told her, "I need to clean your private—like, your vagina because what you have on there could get you pregnant." She added, "I couldn't tell you exactly what he did to me, but

---

[1] Undesignated statutory references are to the Penal Code.

[2] The jury convicted Garcia of the following counts against Jane Doe: forcible lewd conduct on a child (§ 288, subd. (b)(1); counts 6-7); lewd acts on a child (§ 288, subd. (b); counts 8-9); and continuous sexual abuse of a child (§ 288.5, subd. (a); count 10). The jury found true multiple-victim allegations (§ 667.61, subd. (e)(4)) as to counts 6, 7, and 10. Because Garcia does not challenge these convictions, we do not address them further.

2

that's what he told me." After that incident, Garcia warned her not to tell others about it as "they were going to get him in trouble because they were going to think what he was doing was wrong. And then we were not going to be able to live at the house because we were going to lose the house."

M.D. also described an oral copulation incident that occurred one night when she awoke and saw Garcia in her room. M.D. was scared and did not understand what he was doing. She testified Garcia had always tried to teach the children "that nobody should ever touch you inappropriately. And to see him doing that, like, it was kind of, like, confusing and scary."

During M.D.'s testimony, the prosecutor attempted to list Garcia's abuses in chronological order: "[T]he incident in the storage room, that's the first time that you can remember waking up with some kind of inappropriate contact between you and [Garcia]?" M.D. answered affirmatively. The prosecutor continued, "Okay. So I'm going to put headers on these: We have the time in the storage, the storage room. You've told us about the time where you wake up to him between your legs. I'm going to start there in time and move forward to the next time that you can remember [Garcia] touching you inappropriately." M.D. replied, "It's hard for me to give you an exact date, because the things that he would do to me, he did every day. Like, if he—like, if I walked past him, like, he would grab my breast or he would grab my butt. Or, like, he would, like, grab my private. Like, even if I was wearing clothes, like, he just did that." M.D. testified that Garcia would also kiss her on the mouth "every single day."

M.D. testified that from the first abusive act, she tried to stop Garcia because she did not like it and in fact found it "disgusting." She did not tell her mother about any of the incidents because she was scared. Whenever she

3

told Garcia that his actions were wrong, he would ask her why she would get upset, since he already knew her body, and they had trust between them.

M.D. described a separate pattern of Garcia's behavior: "[H]e would come to my room at night. . . . He would, like, leave my room. And I would still have my pants down, like, my pajama pants off and my underwear down to my—like down to my, like, ankles or my knees. And then I would just, like, pick them up and then leave to the restroom." Her going to the restroom alerted him that she was awake, and therefore he would not return to her bedroom.

M.D. described other incidents when Garcia was naked in her presence, or showering with her when she was in middle school. She also saw him masturbating on other occasions.

M.D. testified regarding the count 2 incident—which occurred after she visited her father in Mexico—in the following colloquy:

"[Prosecutor]: . . . I want to go back to the first time you remember [Garcia] actually touching you that you saw with your own eyes. Do you understand my question?

"[M.D.]: Yes.

"[Prosecutor]: Can you think to yourself just in your mind and picture what I'm asking about?

"[M.D.]: Yes.

"[Prosecutor]: Okay. That thought that you have right now, I want to talk about that. Okay. When did that happen?

"[M.D.]: It happened when I came back from a trip with my dad. And [Garcia] told me that he had to check my private to make sure that nobody raped me or did something to me while I was asleep.

"[Prosecutor]: Okay. So the first time you remember is him telling you that he had to check you?

"[M.D.]: Yes."

M.D. testified that Garcia conducted more than 10 such checks of her, during which he spread her vaginal lips. She was nine or ten years old. His actions made her angry and scared. When M.D. would cry, Garcia became upset, saying he did not understand why she was crying since she knew he was acting according to his rules for her visits to see her father.

M.D. described her reaction to Garcia's abuse: "[T]here's a time around the fifth grade that I told him, 'I know what you're doing to me is not right.' And, like, so that he didn't stop. Like, he wouldn't stop. And then like another time I told him, like, 'I know that the things that you're doing to me are not right because my dad doesn't do those things to me.' And [Garcia] told me, like, he didn't care, because it was his house and he was going to do whatever he wanted."

In closing argument, the prosecutor told the jury regarding count 2: "Now, the next count is a [section 288, subdivision (b)(1) offense]. And this is effectively a lewd act with force, fear or duress. And I have it alleged [in the information as M.D. was] 10 years old, hands on vagina for the first time. And if you get that instruction, the judge gave you, [CALCRIM No.] 207[3], it will list what specific acts and time periods we're talking about. . . . I submit to you that the first few times [M.D.] is assaulted, she is told, 'Don't tell or I'll

_____

3    The court instructed the jury with CALCRIM No. 207, which states in part: "The People are not required to prove that the crimes took place exactly on those days but only that they happened reasonably close to those days." It further provides: "It is alleged that the crimes occurred on or about: Count 1: March 6, 2011—March 5, 2012 ([M.D.] 10 years old, mouth on vagina) [¶] Count 2: March 6, 2011—March 5, 2012 ([M.D.] 10 years old, hands on vagina 1st time)."

get in trouble,' I'm going to submit to you that ups the ante over just the touching. It ups the ante because what it says is if you don't comply, if you don't go along with this, there's going to be problems."

## DISCUSSION

Before addressing the sufficiency of the evidence challenge, we preliminarily resolve the parties' dispute regarding which incident was charged in count 2. Garcia contends: "[M.D.] described the first incident of abuse when she awoke to find [him] touching her vagina with his hands and mouth. She did not describe any force, and the incident stopped when [he] realized she was awake."

The People respond that "the evidence and the prosecutor's argument make clear, count 2—which alleged the first time [Garcia] put his hands on M.D.'s vagina—was based on the first 'checking' incident, not the incident involving oral sex."

Garcia argues in reply that the record evidence permitted inferences relating to three potential "first times," that he touched M.D. He points to M.D.'s statement in her forensic interview, the storage room incident, and the vaginal check incident when M.D. returned from Mexico. He asserts that whenever the first time occurred, "it only occurred once, and it necessarily preceded any comment by [him] to [M.D.] not to tell that it had occurred."

We agree with the People's contention that count 2 was based on Garcia's first inspection of M.D.'s vagina upon her return from Mexico. We base this conclusion on M.D.'s testimony set forth above, the information, CALCRIM No. 207, the People's closing argument and the verdict form. Because M.D.'s testimony indicates the storage room incident occurred before the count 2 incident, the jury could have reasonably inferred that Garcia had

6

already warned M.D. not to tell anyone about the abuse before he engaged in the first vaginal check upon her return from Mexico.

A. *Applicable Law*

" 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Veale* (2008) 160 Cal.App.4th 40, 45 (*Veale*).) "We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

" 'Duress' as used in section 288, subdivision (b)(1),". . . "means a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1004, 1006, italics omitted; CALCRIM No. 1111.) "[D]uress is measured by a purely objective standard . . . . [T]he focus must be on the defendant's wrongful act, not the victim's response to it." (*People v. Soto* (2011) 51 Cal.4th 229, 246.) The court instructed the jury with CALCRIM No. 1111 regarding the statutory meaning of duress.

In determining whether a sexual offense was accomplished by duress, the trier of fact must consider the totality of the circumstances, including the victim's age and relationship to the defendant. (*People v. Barton* (2020) 56

7

Cal.App.5th 496, 518; see CALCRIM No. 1111.) " 'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress." (*People v. Senior* (1992) 3 Cal.App.4th 765, 775.)

B. *Analysis*

Garcia was M.D.'s stepfather at the time he abused her and therefore he occupied a position of dominance and authority over the then 10-year-old child. M.D. testified extensively regarding the generally sexualized atmosphere that Garcia created and maintained towards her while growing up, starting when she was in middle school. Garcia insisted that in his house, he could touch any part of her body anytime he felt like doing so. He made her see him naked and while he was masturbating. He did not heed her pleas to stop, but instead elected to operate by his own rules.

Additionally, M.D. testified that in connection with count 2, she was "scared," and did not tell anyone what Garcia did, including her own mother, because she feared she would get him into trouble, and they would lose their home. Considering the totality of the circumstances here, we conclude substantial evidence supports the finding that Garcia used his position as a father figure with authority over M.D. to manipulate and coerce her into allowing him to touch her vagina under the guise of conducting a medical check. (See *Veale, supra,* 160 Cal.App.4th at pp. 46-47; accord, *People v. Cochran* (2002) 103 Cal.App.4th 8, 15-16 (*Cochran*) [duress present in father's molestation of his nine-year-old daughter despite absence of violence or threats where the victim was a "vulnerable and isolated child who engaged in sex acts only in response to her father's parental and physical authority"; *id* at p. 16, fn. 6 [noting that "as a factual matter, when the victim is as young

8

as [nine years old] and is molested by her father in the family home, in all but the rarest cases duress will be present"].)  "We 'must accept logical inferences that the [factfinder] might have drawn from the circumstantial evidence.  [Citation.]'  . . .  Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.)

Garcia argues *People v. Espinoza* (2002) 95 Cal.App.4th 1287 is applicable because "here there was no evidence beyond the fact that Garcia was [M.D.'s] stepfather, who had recently moved into the home.  This fact alone cannot support a finding of duress."  Garcia in effect asserts duress requires more than mere psychological coercion or manipulation and must include evidence of an implied threat of force, violence, danger, hardship, or retribution.  *Espinoza* concluded that there was insufficient evidence of duress based only on the size and age disparity of the victim and the defendant (a 12-year-old girl and her biological father) and the victim's fear of the defendant that was based on nothing more than that the father "continue[d] to molest her." (*Id.* at p. 1321.)  *Espinoza* is factually distinguishable.  Unlike in *Espinoza*, Garcia explicitly directed M.D. not to tell anyone about the abuse, which the jury could reasonably infer operated as an implicit threat that "the child should not otherwise protest or resist the sexual imposition." (*People v. Senior, supra*, 3 Cal.App.4th at p. 775.)  There is no evidence that the defendant in *Espinoza* gave any similar direction to his daughter. (*Espinoza*, at pp. 1292-1295.)  Garcia's reliance on *Espinoza* is accordingly misplaced.

Further, several courts have rejected the argument that psychological coercion without more does not establish duress.  The *Cochran* court

9

explained:  "The very nature of duress is psychological coercion.  A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress, particularly if the child is young and the defendant is her parent.  We also note that such a threat also represents a defendant's attempt to isolate the victim and increase or maintain her vulnerability to his assaults."  (*Cochran*, *supra*, 103 Cal.App.4th at p. 15; accord, *Veale*, *supra,* 160 Cal.App.4th at p. 49 [" '[D]uress involves psychological coercion' "]; *People v. Mejia* (2007) 155 Cal.App.4th 86, 101 [warning victim not to report incidents "bespeaks psychological coercion, not normal sexual relations"].)  Additionally, the California Supreme Court later approved a definition of duress in child molestation cases consistent with *Cochran*, describing duress as " 'us[ing] some form of psychological coercion to get someone else to do something.' "  (*People v. Soto*, *supra*, 51 Cal.4th 229 at p. 243.)

## DISPOSITION

The judgment is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

DATO, J.

RUBIN, J.

11